THE PEOPLE, plaintiffs in error *v.* ROGERS, defendant in error.

18   9<br>143  364<br>18   9<br>168   31

The mere fact that a prisoner was in custody at the time of making declarations offered in evidence upon his trial, is not sufficient to exclude them where no threats, promises or other inducements to make a confession were held out to him.

The voluntary intoxication of one who, without provocation, commits a homicide, although amounting to phrenzy, does not exempt him from the same construction of his conduct, and the same legal inferences upon the question of intent as affecting the grade of his crime, which are applicable to a person entirely sober.

Evidence of intoxication is, however, always admissible. Where the crime was committed after provocation, it may be considered in determining whether it was done in the heat of passion, and in other cases whether threatening words were uttered by the culprit with deliberate purpose or otherwise, and generally to explain his conduct.

Insanity occasioned by previous habits of intemperance, and not directly resulting from the immediate influence of intoxicating liquors, is entitled to the same consideration as insanity from any other cause.

WRIT OF ERROR to the Supreme Court, sitting in the first district, brought by the district attorney pursuant to the statute of 1852 (*ch.* 82), to review a judgment of that court in favor of James Rogers, the present defendant in error.

SMITH.—VOL. IV.    2

Rogers was indicted in the Court of General Sessions of the Peace, of the city and county of New York, for the murder of John Swanston, in that city, on the 17th of October, 1857. The trial took place in that court, on the twelfth November of that year, before A. D. RUSSELL, City Judge. It appeared that Swanston, the deceased, and his wife, were returning from market about ten o'clock in the evening, when they were met by the prisoner and two other young men, with whom they were unacquainted, at the corner of Twenty-first-street and the Tenth-avenue. The prisoner rudely ran against the wife of the deceased, pushing her upon her husband. According to the testimony of the wife, the prisoner, at the time, asked the deceased what he was saying, and the latter answered, "What is that to you?" One of the prisoner's companions said to him, "They are not talking to you." At this time the three had passed the deceased and his wife. They then turned about and came back towards the deceased, who turned his head towards them, and the prisoner, who had been taken hold of by the other two, broke from them, came up to the deceased, stabbed him in the breast and then ran up the avenue. The wound was about three inches deep, and penetrated the artery of the heart, and the deceased died immediately. The weapon was not found. The surgeon testified that the wound appeared to have been made by a sharp instrument, which he judged was a large dirk-knife. The other evidence upon that point tended to show that shortly before, and on the same evening, the prisoner had in his pocket a jack-knife. The prosecution proved the prisoner's confession that it was a common pocket-knife, and that he had thrown it away when he heard that the man he had struck was dead; and his mother and sister swore that he carried a small pocket-knife, with two blades, and they did not know of his having any other knife. The companions of the prisoner and another person, all called by the prose cution, gave testimony as to the circumstances of the homi-

cide; one, a man who lived near the spot, saw the affair from his window. He saw the motion of the prisoner as though striking the deceased, who went a few steps and then fell. He saw no other striking. The two young men who were with the prisoner agreed in testifying that the affair commenced by the prisoner running, or, as one of them said, staggering, against the deceased's wife; and they united in saying that the deceased then struck at the prisoner without hitting him. One of them said that they, the two witnesses, then took the prisoner away, but he broke from them, came up to the deceased and struck the fatal blow; the other represented that there were mutual and successive blows between the deceased and the prisoner after they had let the prisoner go, and that the latter said he wanted to fight. They both swore that the prisoner had drank beer with them twice during the evening, that he was intoxicated, and that they were trying to get him home. The prisoner went to the house of his mother, which was his home, immediately after the homicide; and she and his sister testified that he was then so much intoxicated that he could not walk, but fell upon the floor, and that they had to undress him and put him to bed. The testimony as to intoxication was given without any objection on the part of the public prosecutor, and a portion of it on his examination.

Two exceptions were taken to rulings of the judge upon the reception of testimony. The first arose as follows: The prosecution proved, by a boy of the name of Scott, that a few minutes before the homicide the prisoner and his two companions passed by where the witness was standing, in the door of a house, eating an apple. The prisoner asked him for the apple and then tried to get something out of his pocket, and the witness saw that he had a jack-knife. There was an objection to this evidence by the prisoner's counsel as immaterial, but the objection was overruled, and the counsel excepted. The confession of the prisoner, which has been mentioned, respecting the knife, was proved by a

New York policeman, who had him in custody, and who brought him from New Brunswick in New Jersey, where he received him from a constable at the jail, to New York, without process. The admission in substance was, that he, the prisoner, was drunk, and killed the deceased with a common pocket-knife. The objection to this testimony conceded in terms that no inducement had been held out to the prisoner, but it assumed that no admission made by an accused person, when under arrest, could be used against him. The prisoner's counsel excepted to the decision overruling the objection. The bill of exceptions states that there was other testimony on the part of the defendant not set forth in it. In the charge to the jury, the judge stated the definition of murder and of the first and third degrees of manslaughter, as contained in the Revised Statutes, with some remarks upon the law of the case. He stated that if the prisoner had time to think, and did intend to kill, it was murder, though he conceived the intent but on the instant before the blow was struck; but if they were satisfied that the mortal blow was struck in the heat of passion, without a design to effect death, the offence would be manslaughter in the third degree. There is a general exception to the charge. The remainder of the bill of exceptions, upon which the most material of the questions in the case arise, is as follows: "The counsel for the prisoner requested the court to charge that, if it appeared by the evidence that the condition of the prisoner from intoxication was such as to show that there was no intention or motive, by reason of drunkenness, to commit the crime of murder, that the jury should find a verdict of manslaughter. But the court refused to instruct the jury in the words of the proposition, but charged that under the old law intoxication was an aggravation of crime; but that intoxication never excused crime unless it was of the degree to deprive the offender of his reasoning faculties; to which refusal to charge, the prisoner's counsel excepted.'

The jury returned a verdict of guilty of murder, and the court sentenced the prisoner to be executed.

A writ of error was allowed, with a stay of execution. The record, with the bill of exceptions, was returned to the Supreme Court, where, after argument, the judgment of the Sessions was reversed and a new trial awarded, upon which the present writ of error was brought on behalf of the people.

*John Graham*, for the plaintiffs in error.

*E. W. Andrews*, for the defendant in error.

DENIO, J. I do not perceive that there was any valid objection to the testimony of the witness Scott. The surgeon had testified that the injury of which the deceased died was an incised wound. The object of the prosecution was to show that it was inflicted by the defendant, and to that end it was proved that he struck the deceased immediately before he fell dead; but the witnesses who testified to this, did not see any weapon. If it could be shown that the prisoner had a knife or other similar weapon about his person at the time, such proof would considerably advance the case of the prosecution; and it was this fact which Scott swore to. He saw the handle of a knife in the prisoner's possession, as the latter attempted to draw it from his pocket, while on his way to the place where the homicide took place, and only a few minutes before that time.

The objection to the testimony of the policeman assumes that no admission by a person accused of crime, made to an officer who has him in custody, can be received. It was not pretended that any threats, promises or other inducements to make a confession had been held out to the prisoner, but the objection was placed distinctly upon the ground first mentioned. I have looked carefully into all the cases referred to by the defendant's counsel, in support

of that position, and many others, and do not find that it has ever been held that the single fact of the prisoner being in custody was sufficient to exclude his declarations, whether made to the officer or to third persons. On the contrary, many of the cases, upon the competency of confessions, show that the prisoner was in custody at the time, and the question generally has been, whether the confession was voluntary, or was influenced by what was said to him by the officer or by others. In *Ward* v. *The People* (3 *Hill,* 395), the prisoner made an admission while in the custody of a constable; and a question having arisen, whether it ought not to be excluded in consequence of promises of impunity, held out by the prosecutor before the arrest, the court held it admissible, and it was received. *The Commonwealth* v. *Mosler* (4 *Barr,* 264) was likewise the case of a confession made by a prisoner while in the custody of a constable, and the point made by the defendant was, that a caution should have been given, such as is required from examining magistrates; but the court held it unnecessary, and decided that the evidence was competent. *Rex* v. *Jane Richards* (5 *Carr. & Payne,* 318) was also the case of an admission made to a constable while holding the prisoner in custody, which was held to be competent, no inducement having been held out at the time. It is very plain that this exception cannot be sustained.

The principal exception to the judge's charge which is now relied on, relates to the consideration which should be given to the proof that the prisoner was intoxicated at the time of the homicide. The commission of crime is so often the attendant upon and the consequence of drunkenness, that we should naturally expect the law concerning it to be well defined. Accordingly we find it laid down as early as the reign of EDWARD VI (1548), that "if a person that is drunk kills another, this shall be felony, and he shall be hanged for it; and yet he did it through ignorance, for when he was drunk he had no understanding nor memory; but

inasmuch as that ignorance was occasioned by his own act and folly, and he might have avoided it, he shall not be privileged thereby." (*Plowden*, 19.) The same doctrine is laid down by COKE in the Institutes, where he calls a drunkard *voluntarius dæmon*, and declares that "whatever hurt or ill he doeth, his drunkenness doth aggravate it." (3 *Thomas' Coke*, 46.) So in his Reports it is stated that "although he who is drunk is for the time *non compos mentis*, yet his drunkenness does not extenuate his act or offence, nor turn to his avail; but it is a great offence in itself, and therefore aggravates his offence, and doth not derogate from the act which he did during that time; and that as well in cases touching his life, his lands, his goods, or any other thing that concerns him." (*Beverley's case*, 4 *Co.*, 125, *a.*) Lord BACON, in his "Maxims of the Law," dedicated to Queen ELIZABETH, asserts the doctrine thus: "If a madman commit a felony, he shall not lose his life for it, because his infirmity came by the act of God; but if a drunken man commit a felony, he shall not be excused, because the imperfection came by his own default." (*Rule V.*) And that great and humane Judge, Sir MATTHEW HALE, in his "History of the Pleas of the Crown," written nearly two hundred years ago, does not countenance any relaxation of the rule. "The third kind of *dementia*," he says, "is that which is *dementia affectata*, namely, drunkenness. This vice doth deprive men of the use of reason, and puts many men into a perfect but temporary phrenzy; and therefore, according to some civilians, such a person committing homicide shall not be punished simply for the crime of homicide, but shall suffer for his drunkenness, answerable to the nature of the crime occasioned thereby, so that yet the primal cause of the punishment is rather the drunkenness than the crime committed in it; *but by the laws of England* such a person shall have no privilege by his voluntarily contracted madness, but shall have the same judgment as if he were in his right senses." He states two exceptions to the rule, one where

the intoxication is without fault on his part, as where it is caused by drugs administered by an unskillful physician, and the other, where indulgence in habits of intemperance has produced permanent mental disease, which he calls "*fixed phrenzy.*" (1 *Hale*, 32.) Coming down to more modern times we find the principle insisted upon by the enlightened Sir WILLIAM BLACKSTONE. "The law of England," he says, "considering how easy it is to contract this excuse, and how weak an excuse it is (though real), will not suffer any man thus to privilege one crime by another." (4 *Com.*, 26.) A few recent cases in the English courts will show the consistency with which the rule has been followed down to our own times. In *Burrow's case* (*Lewin's Cr. C.*, 75, *A. D.* 1823), the prisoner was indicted for a rape, and urged that he was in liquor. HOLROYD, J., addressed the jury as follows: "It is a maxim in law that if a man gets himself intoxicated, he is answerable to the consequences, and is not excusable on account of any crime he may commit when infuriated by liquor, provided he was previously in a fit state of reason to know right from wrong. If, indeed, the infuriated state at which he arrives should continue and become a lasting malady, then he is not answerable." A similar charge was given to the jury in the next case in the same book, where drunkenness was urged upon the trial of an indictment for burglary. Patrick Carroll was tried in 1835, at the Central Criminal Court, before a judge of the King's Bench and a judge of the Common Pleas, for the murder of Elizabeth Browning. It appeared that shortly before the homicide the prisoner was very drunk. His counsel, though he admitted that drunkenness could not excuse from the commission of crime, yet submitted that in a charge for murder, the material question being whether the act was premeditated or done only with sudden heat and impulse, the fact of the party being intoxicated was a proper circumstance to be taken into consideration, and he referred to a case before HOLROYD, J., reported in 2 *Russell on Crimes*, 8

The People *v.* Rogers.

(*Rex* v. *Grindley*), where that doctrine was laid down. PARKE, J., in summing up, said: "Highly as I respect that late excellent judge, I differ from him, and my brother LITTLEDALE [the associate] agrees with me. He once acted on that case, but afterwards retracted his opinion, and there is no doubt that that case is not law. I think that there would be no safety for human life if it were considered as law." The prisoner was convicted and executed. (7 *Carr. & Payne*, 145.) It would be easy to multiply citations of modern cases upon this doctrine; but it is unnecessary, as they all agree upon the main proposition, namely, that men tal alienation,. produced by drinking intoxicating liquors, furnishes no immunity for crime. *Rex* v. *Meakin* (7 *Carr & Payne*, 297), and *Rex* v. *Thomas* (7 *id.*, 817), may be mentioned; and in this country, *The United States* v. *Drew* (5 *Mason C. C. R.*, 28), and *The United States* v. *McGlue* (1 *Curtis C. C. R.*, 1), will be found to maintain the principle upon the authority of Judge STORY and Judge CURTIS, of the Supreme Court of the United States. These last two cases are interesting, not only for stating the general principle, but for confirming the distinction laid down so long ago by Sir MATTHEW HALE, that where mental disease, or as he terms it, a "fixed phrenzy," is shown to be the result of drunkenness, it is entitled to the same consideration as insanity arising from any other cause. The first of them was a case of *delirium tremens*, and Judge STORY directed an acquittal on that account. In the other the evidence left it doubtful whether the furious madness exhibited by the prisoner was the result of present intoxication, or of delirium supervening upon long habits of indulgence. This state of the evidence led Judge CURTIS to state the rule and the exception with great force and clearness. In this state the cases of *The People* v. *Hammell* and *The People* v. *Robinson*, reported in the second volume of Judge PARKER's Reports (*pp.* 223, 235), show the consistency with which the doctrine has been adhered to in our criminal courts and in the Supreme Court

The opinion in the last case contains a reference to several authorities to the same effect in the other states of the Union. Where a principle in law is found to be well established by a series of authentic precedents, and especially where, as in this case, there is no conflict of authority, it is unnecessary for the judges to vindicate its wisdom or policy. It will, moreover, occur to every mind that such a principle is absolutely essential to the protection of life and property. In the forum of conscience there is no doubt considerable difference between a murder deliberately planned and executed by a person of unclouded intellect, and the reckless taking of life by one infuriated by intoxication; but human laws are based upon considerations of policy, and look rather to the maintenance of personal security and social order, than to an accurate discrimination as to the moral qualities of individual conduct. But there is, in truth, no injustice in holding a person responsible for his acts committed in a state of voluntary intoxication. It is a duty which every one owes to his fellow-men and to society, to say nothing of more solemn obligations, to preserve, so far as it lies in his own power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable. But if by a voluntary act he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which in that state he may do to others or to society.

Before proceeding to examine the judge's charge, it is necessary to state one other principle connected with the subject of intoxication. I am of the opinion that, in cases of homicide, the fact that the accused was under the influence of liquor, may be given in evidence in his behalf. The effect which the evidence ought to have upon the verdict will depend upon the other circumstances of the case. Thus, in *Rex* v. *Carroll*, which was a case of murder by stabbing, there was not, as the court considered, any provo-

The People *v.* Rogers.

cation on the part of the deceased, and it was held that the circumstance that the prisoner was intoxicated was not at all material to be considered. *Rex* v. *Meakin* was an indictment for stabbing with a fork, with intent to murder, and it was shown that the prisoner was the worse for liquor. ALDERSON, Baron, instructed the jury that, with regard to the intention, drunkenness might be adverted to according to the nature of the instrument used. "If," he said, "a man uses a stick, you would not infer a malicious intent so strongly against him, if drunk when he made an intemperate use of it, as you would if he had used a different kind of weapon; but where a dangerous instrument is used, which, if used, must produce grievous bodily harm, drunkenness can have no effect upon the consideration of the malicious intent of the party." In *Rex* v. *Thomas*, for maliciously stabbing, the person stabbed had struck the prisoner twice with his fist, when the latter, being drunk, stabbed him, and the jury were charged that drunkenness might be taken into consideration in cases where what the law deems sufficient provocation has been given, because the question in such cases is, whether the fatal act is to be attributed to the passion of anger excited by the previous provocation; and that passion, it was said, is more easily excitable in a person when in a state of intoxication than when he is sober. So, it was added, where the question is whether words have been uttered with a deliberate purpose, or are merely low and idle expressions, the drunkenness of the person uttering them is proper to be considered. But if there is really a previous determination to resent a slight affront in a barbarous manner, the state of drunkenness in which the prisoner was ought not to be regarded, for it would furnish no excuse."

It must generally happen, in homicides committed by drunken men, that the condition of the prisoner would explain or give character to some of his language, or some part of his conduct, and, therefore, I am of opinion that it

would never be correct to exclude the proof altogether. That it would sometimes be right to advise the jury that it ought to have no influence upon the case, is, I think, clear from the foregoing authorities. In a case of lengthened premeditation, of lying in wait, or where the death was by poisoning, or in the case of wanton killing without any provocation, such an instruction would plainly be proper.

Assuming the foregoing positions to be established, I proceed to an examination of the exceptions to the charge of the judge. It is difficult to know precisely what was meant by the request to charge; but I think its sense may be expressed thus—that drunkenness might exist to such a degree that neither an intention to commit murder, nor a motive for such an act, could be imputed to the prisoner. It was, therefore, asked that it should be left to the jury to determine whether such a degree of intoxication had been shown, and that they should be instructed that if it had, the prisoner should be found guilty of manslaughter only. We must lay out of view, as inapplicable, the case of a person who had become insensible from intoxication, and who was performing an act unaccompanied by volition. There was nothing in the evidence to show that the prisoner's conduct was not entirely under the control of his will, or which would render it possible for the jury to find that he did not intend to stab the deceased with his knife. The mind and will were no doubt more or less perverted by intoxication, but there was no evidence tending to show that they were annihilated or suspended. Assuming, therefore, that the request did not refer to such a hypothesis, the only other possible meaning is, that it supposes that the jury might legally find that the prisoner was so much intoxicated that he could not be guilty of murder, for the want of the requisite intention and motive; and the request was that they might be so instructed. This would be precisely the same thing as advising them that they might acquit of murder on account of the prisoner's intoxication, if they thought

The People *v.* Rogers.

it sufficient in degree. It has been shown that this would be opposed to a well established principle of law. The judge was not at liberty so to charge, and the exception to his refusal cannot be sustained. What he did charge on the subject of intoxication was more favorable to the prisoner than he had a right to claim. It implies that if he was so far intoxicated as to be deprived of his reasoning faculties, it was an excuse for the crime of murder; or, as perhaps it was intended to state, that he could not be guilty of murder. The rule which I have endeavored to explain, assumes that one may be convicted of murder or any other crime, though his mind be reduced by drunkenness to a condition which would have called for an acquittal, if the obliquity of mind had arisen from any other cause. The judge ought to have charged that if a man makes himself voluntarily drunk, that is no excuse for any crime he may commit while he is so, and that he must take the consequences of his own volunary act. (*Rex* v. *Thomas, supra.*) The charge, therefore, gave the prisoner the chance of an acquittal, to which he was not entitled; but this was not an error of which he can take advantage.

The judgment of the Court of Sessions was reversed by the Supreme Court on the ground, as it appears from the opinion, that the judge altogether withdrew the attention of the jury from the consideration of the fact that the prisoner was intoxicated. I do not so understand the charge; all the evidence which was offered to show the prisoner's condition in that respect, was received without objection. The judge refused to charge that it would entitle him to be acquitted of murder, whatever the jury might think of its degree. Upon the question whether it could be taken into consideration to explain or characterize his acts, nothing appears to have been said either by the counsel or the judge. It does not appear whether the whole charge is given, or only such parts as were excepted to. As I do not find any error in the portions which are set forth, I am of opinion

that the judgment of the sessions ought not to have been reversed on the ground that it is not sufficiently full in other respects.

Under the act of 1855, courts of error are to order a new trial when they are satisfied that a conviction for murder is against evidence or against law, or that justice requires another trial. (*p.* 613, § 3.) In the exercise of this jurisdiction, I have examined this case with the attention which its importance to the prisoner and to the public merits. It satisfactorily appeared that the prisoner, without any provocation on the part of the deceased, who was a stranger to him, came upon him and stabbed him to the heart with a knife. The jury have found, and upon sufficient evidence, as I think, that the prisoner intended to kill the deceased. The case is within the principle of *The People* v. *Clark* and *The People* v. *Sullivan* (3 *Seld.*, 385, 396). Independently of the question of intoxication, already disposed of, the evidence disclosed a clear case of murder.

The judgment of the Supreme Court ought to be reversed, and the proceedings remitted to that court, with directions to pronounce sentence anew against the prisoner.

HARRIS, J. That the defendant was guilty of some crime, was conceded upon the trial. He had committed homicide. The act of killing was perpetrated with a deadly weapon. The only question to be determined by the jury was, whether the crime was murder or manslaughter.

Upon the law applicable to this question, the jury were properly instructed. They were told that if there was an intent to kill, even though that intent was conceived but the instant before the fatal blow was struck, the crime was murder. But if, on the other hand, the blow was struck in the heat of passion, without a design to effect death, the crime was manslaughter. This charge was unobjectionable. The distinction between the crime of murder and that of manslaughter was sufficiently stated. The jury were made

The People *v.* Rogers.

to know that it was their duty to convict the defendant of the one offence or the other, according as they should find upon the question of intent. If they should find that there was an intent to kill, they were to pronounce the defendant guilty of murder. If they should find an absence of such intent, they were to convict of manslaughter only.

But there was evidence to show that, when he struck the deadly blow, the defendant was intoxicated; and the court was asked to charge the jury that, " if it appeared by the evidence that the condition of the prisoner from intoxication was such as to show that there was no intention or motive, by reason of drunkenness, to commit the crime of murder, they should convict him of manslaughter." The court refused so to charge, but, upon this point, instructed the jury " that intoxication never excused crime, unless it was of such a degree as to deprive the offender of his rea soning faculties."

In the proposition, as it was thus given to the jury, there was no error. No rule is more familiar than that intoxication is never an excuse for crime. There is no judge who has been engaged in the administration of criminal law, who has not had occasion to assert it. Even where *intent* is a necessary ingredient in the crime charged, so long as the offender is capable of conceiving a design, he will be presumed, in the absence of proof to the contrary, to have intended the natural consequences of his own act. Thus, if a man, without provocation, shoot another or cleave him down with an ax, no degree of intoxication, short of that which shows that he was at the time utterly incapable of acting from *motive*, will shield him from conviction. This was, in substance, the doctrine which the jury received from the court in this case. The defendant had struck a blow with a deadly weapon, which had resulted in immediate death. To this act, the law, without further proof, imputed guilty design. If the perpetrator would escape the consequences of an act thus committed, it was incumbent on him to show, either

that he was incapable of entertaining such a purpose, or that the act was committed under provocation. In respect to the latter, there was nothing said by the court, nor any request to charge. Had it been contended that the blow was struck in the heat of passion, it might then have been proper to instruct the jury that, in determining this question, the intoxication of the defendant might well be considered. No such ground appears to have been taken by the counsel for the defence. There was, indeed, some testimony tending to show that the defendant had been struck before he committed the act for which he was tried. But the weight of the testimony is clearly against this theory of the case. It was no doubt judicious, therefore, for the defendant's counsel to refrain from asking the court to charge that the intoxication of the defendant might be considered by the jury in determining whether the blow was struck in the heat of passion, or with premeditated design. Had such a request been made, I think it would have been the duty of the court so to charge; though from the state of the testimony, it is not likely that the result would have been favorable to the defendant.

The Supreme Court seem to have understood that, in all cases where, without it, the law would impute to the act a criminal intent, drunkenness may be available to disprove such intent. I am not aware that such a doctrine has before been asserted. It is certainly unsound. The adjudications upon the question, both in England and this country, are very numerous, and are characterized by a singular uniformity of language and doctrine. They all agree that, where the act of killing is unequivocal and unprovoked, the fact that it was committed while the perpetrator was intoxicated cannot be allowed to affect the legal character of the crime. But when the circumstances are such as to raise the question whether the act was the result of design or the impulse of sudden passion, the intoxication of the accused is a proper subject of consideration. " Drunkenness," says

PARK, B., in *Rex* v. *Thomas* (7 *Carr. & Payne*, 817), "may be taken into consideration in cases where what the law deems sufficient provocation has been given, because the question is, in such cases, whether the fatal act is to be attributed to the passion of anger, excited by the previous provocation, and that passion is more easily excitable in a person when in a state of intoxication than when he is sober." Again, in *Rex* v. *Meakin* (7 *Carr. & Payne*, 297), ALDERSON, B., says : "With regard to the intention, drunkenness may, perhaps, be adverted to according to the nature of the instrument used. If a man use a stick, you would not infer a malicious intent so strongly against him, if drunk when he made an intemperate use of it, as you would if he had used a different kind of weapon ; but, where a *dangerous* weapon is used, which, if used, must produce grievous bodily harm, drunkenness can have no effect on the consideration of the malicious intent."

This subject has been well considered by the Court of Appeals in South Carolina, in *The State* v. *McCarts* (1 *Speers*, 384). In pronouncing the judgment of the court, WARDLAW, J., after referring to the language of PARK, B., in *Rex* v. *Thomas*, above cited, and what is said on the subject in *Russell on Crimes* (*p.* 8), says: "To this doctrine I subscribe, understanding by it that he who is in a state of voluntary intoxication shall be subject to the same rule of conduct, and the same legal inferences, as the sober man, but that where a provocation has been received, which, if acted upon instantly, would mitigate the offence of a sober man, and the question in the case of a drunken man is, whether that provocation was in truth acted upon, evidence of intoxication may be considered in deciding that question. The law infers malice against the drunkard who, in his phrenzy, shoots into a crowd and kills, he knows not whom, no less than against a sober man for like conduct. And it would be jeoparding the peace and safety of society to say that he who, by half a dozen glasses, is habitually rendered

irritable and fierce, shall be looked upon with more indulgence, when he has barbarously resented a trivial affront, because he had taken the quantity of liquor requisite to make him a savage." So in *Kelly* v. *The State* ( 3 *Sm. & M.,* 518 ), the defendant had been indicted for murder in killing his slave. It was proved that when the act was committed he was drunk. The counsel for the defendant had asked the court to instruct the jury that they might take the evidence of intoxication into consideration as proof, more or less strong, according to their view of the circumstances, of the absence of that premeditated design required as an indispensable ingredient of murder. The court declined so to charge. In reviewing the case upon error, the Court of Appeals, in Mississippi, say: "The fact of the party being intoxicated has, indeed, been holden to be a circumstance proper to be taken into consideration, where the sole question is, whether an act was premeditated or done only with sudden heat or impulse."

In Pennsylvania, Tennessee and some other states, the crime of murder is classified by statute into two degrees. When the killing is "willful, deliberate, malicious and premeditated," it is murder in the first degree. All other kinds of murder are declared to be murder in the second degree. Where this distinction prevails, it has been held that the influence of intoxication may be considered by the jury in determining whether there had been that deliberation and premeditation necessary to constitute the crime of murder in the first degree. But it has been repeatedly said, when asserting this rule, that it is confined to the question whether the crime is murder in the first or second degree, under the statute. In such a case, deliberation as well as design is a question of fact to be determined by the jury. ( *Swan* v. *The State,* 4 *Humph.,* 136 ; *Pirtle* v. *The State,* 9 *id.,* 670 ; *Haile* v. *The State,* 11 *id.,* 154.)

In the case now before us, there was no attempt to show that the act of killing was committed under the impulse of

The People *v.* Rogers.

sudden passion.   All that the court was requested to do was, to instruct the jury that if they were satisfied that, by reason of intoxication, there was no intention or motive to commit the crime of murder, they should convict the defendant of manslaughter only.   In refusing so to charge, there was no error.   If, by this request, the counsel for the defendant meant, as the request seems to have been interpreted by the Supreme Court, that the jury should be instructed to take into consideration the intoxication of the defendant in determining the intent with which the homicide was committed, the proposition is not law.   It has never yet been held, that the crime of murder can be reduced to manslaughter by showing that the perpetrator was drunk, when the same offense, if committed by a sober man, would be murder.   If, on the other hand, it was intended that the court should instruct the jury that if, by reason of intoxication, the defendant was so far deprived of his senses as to be incapable of entertaining a purpose, or acting from design, the jury were so instructed.   This was enough, unless the counsel for the defendant desired to have the jury decide whether the act was not committed in the heat of passion.   In that case, his proposition must have been very differently framed.

Upon the whole case, I am satisfied that no error has been committed by the court, and no injustice done the defendant.   The judgment of the Supreme Court should, therefore, be reversed, and that of the sessions affirmed.

Judgment of the Supreme Court reversed and that of the General Sessions affirmed.