# ULSTER OYER AND TERMINER.

## THE PEOPLE OF THE STATE OF NEW YORK agt. ROBERT W. BATTING.

*The law of murder laid down in the first and second degrees.*

The law infers an intent to do what a party does do.

Where a prisoner on a trial for murder is shown to have taken a weapon from his pocket and without any cause or provocation whatever run it into the body of his victim in a vital part from which wound the victim dies, the law infers that the prisoner intended to do exactly what he did do, to wit, take his life.

This at common law and under our statutes, until they were recently amended, would have been declared murder in the first degree and the penalty death.

And the excuse that the prisoner was drunk and scarcely conscious of what he did, can be of no avail at common law. The books contain but one rule upon this subject from the earliest time down to the present, and that is, if a person voluntarily becomes drunk he shall be accountable for what he does in that condition.

In this state the legislature, in 1873, divided the crime of murder into two degrees, the one where the intent to take life was a *deliberate* intent, the other where there is a simple intent without the deliberation and coolness which now marks the former and which is the element making the crime of murder in the first degree. The penalty under this statute is imprisonment for life.

In fixing the grade of crime of which the prisoner is guilty, the evidence of his intoxication becomes very important and is to be carefully weighed.

Whilst the jury cannot receive the evidence of drunkenness to excuse the crime or to make it less than murder in the second degree, yet they can receive it for the purpose of showing that the party did not *deliberately* premeditate.

*Indictment for the murder of John Tompkins, on October 21st, 1874.*

*Charge of judge* WESTBROOK *to the jury, and the sentence of the prisoner, delivered and pronounced April 22d, 1875. Prisoner convicted of murder in the second degree.*

AFTER taking all the testimony in the *Batting Case* the counsel, by agreement, consented to submit the case to the jury without summing up, whereupon judge WESTBROOK, after stating that he had understood counsel to waive any address to the jury and that the evidence was closed, charged the jury as follows:

*Judge* WESTBROOK'S *Charge.* — We have reached the conclusion of this most painful trial. It is painful from any stand-point from which we see fit to look at it. It is painful to think that a person could deliberately take the life of a fellow-being if that person was conscious of the act. It is equally painful to think that any person should so far craze himself as to unconsciously do so awful a deed and commit so terrible a crime. This case is such an exhibition of our poor fallen human nature that we will always carry it with us, and it will ever cause us to remember that man is by nature a weak, wayward being, addicted to great sins and inclined to do desperate deeds.

On the 21st day of October, 1874, about half-past ten o'clock at night, Batting came into the Shaffer House. The deceased arrived there shortly after and sat down in a chair. He was injuring no person; he was disturbing no person. He seems to have been in a semi-unconscious drunken or sleepy state, reposing his head in his right hand and unconscious of all his surroundings. The prisoner discovering him goes up to him and asks him, in substance, this: "Are you following me around to whip me?" The answer which the man gives is either yes or humph. The witnesses seem to differ somewhat as to what the exact answer was. Upon receiving this answer, or some answer, the prisoner, in the twinkling of an eye, passed his hand into the inside breast pocket of his coat,

draws from there a dangerous weapon, a deadly weapon, I might say, and with great rapidity strikes the deceased, while his head was still reclining upon his hand, three dangerous blows, one below the shoulder blade, another right by the shoulder blade, the weapon striking against and chipping off a piece of it, passed through the second and third rib, through the lungs and into the cavity of the chest. Then a third blow is given near the left ear, which passes through the face and throat to the opposite jaw, completely severing the external carotid artery. The last two wounds — that penetrating the lungs and the one cutting the artery in two — were necessarily mortal, of which the deceased died.

That is, in short, the act. It is for the jury to first find whether the facts are as I have just detailed them; and, second, it is for the jury to find the intent with which the blows were struck. There is no dispute or disagreement in the evidence. All the witnesses concur in the narration of facts; and in arriving at the intent of the prisoner you will be guided by the rules of law which the court will lay down for your direction.

The law infers an intent to do what a party does do. If I come to one of you and draw a pistol and shoot you, it infers that I intend to kill you, if you die from the wounds; or if I take a weapon from my pocket and run that weapon into your body in a vital part and you die, the law infers that I intended to kill you; and so in regard to the prisoner at the bar. He is presumed to have intended to do exactly what he did do. Having drawn this dagger and most deadly weapon and inflicted three most grievous and mortal wounds we are to infer, in the absence of any explanation, that he intended to do exactly what he did do, to wit, to take the life of John Tompkins.

This, at common law and under our statutes, until they were recently amended, would have undoubtedly sent the prisoner to the gallows and to the hands of the executioner.

It is said in his behalf that he was not conscious of what

he did do; that his mind had become crazed, and the brain, which ordinarily directed and controlled all his movements, was fired by rum, so that he is not responsible for the act which he did do. However strong the argument may be in the forum of conscience, in the dispensation of criminal justice, it can find no place. It would not do to expose society to a doctrine so pernicious as this. It would never answer for us to say that a party who, in a drunken freak, comes into your house and murders you whilst you are harmless and inoffensive shall go free and unpunished. Life is too sacred and too dear — too valuable a gift from the Father and Source of all life to be taken in this manner. The books contain but one rule upon this question from the earliest time down to the present, and that is, if a person voluntarily becomes drunk he shall be accountable for what he does while in that condition. This is for the purpose of preventing men from becoming drunk, from putting themselves in a condition where they shall be like beasts preying upon society. Human safety, human life and the protection of the citizen requires this rule. Without this society could not exist. That you may see this rule very clearly I will read to you from a single authority, which is one of many:

" The law often implies malice from the manner in which the killing was done, or the weapon with which the blow was stricken. In such case it is murder, though the perpetrator were drunk. And no degree of drunkenness will excuse in such case, unless by means of drunkenness an habitual or fixed madness be caused. The law in such cases does not seek to ascertain the actual state of the perpetrator's mind, for the fact from which it is implied having been proved, the law presumes its existence, and proof in opposition to this presumption is irrelevant and inadmissible. Hence, a party cannot show he was so drunk as not to be capable of entertaining a malicious feeling. The conclusion of law is against him."

Judge WESTBROOK proceeded: The doctrine which I have

just read to you is from *Wharton's Law of Homicide* (*page* 371), and has been fully approved in several cases in this state. The exact question was also before our court of appeals, in the case of *The People* agt. *Rogers* (18 *N. Y.,* 9), and I will read to you a portion of the opinion of judge DENIO. In giving the judgment of the court in that case, he says:

"When a principle in law is found to be well established by a series of authentic precedents, and especially where, as in this case, there is no conflict of authority, it is unnecessary for the judges to vindicate its wisdom or policy. It will, moreover, occur to every mind that such a principle is absolutely essential to the protection of life and property. In the forum of conscience there is no doubt considerable difference between a murder deliberately planned and executed by a person of unclouded intellect, and the reckless taking of life by one infuriated by intoxication; but human laws are based upon considerations of policy, and look rather to the maintenance of personal security and social order, than to an accurate discrimination as to the moral qualities or individual conduct. But there is, in truth, no injustice in holding a person responsible for his acts committed in a state of voluntary intoxication. It is a duty which every one owes to his fellow-men and to society, to say nothing of more solemn obligations, to preserve, so far as it lies in his own power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vice, the law holds him not accountable. But if by a voluntary act he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered censurable for any injury which in that state he may do to others or to society."

The judge proceeds: The opinion is quite lengthy, and I only read to you a part of it. This doctrine laid down by the court of appeals in that case, is again affirmed and followed by the same court in *Kenny* agt. *The People* (31 *N. Y.,* 330), which was determined in 1865. I will read to you

a part of the opinion of DAVIES, J., in that case, who, after
quoting the remarks of DENIO, J., I have just declared to
you, says:

"The same doctrine was long since enunciated by that emi-
nent judge, lord MANSFIELD, who said, in the celebrated case
of *The Chamberlain of London* agt. *Evans,* in the House of
Lords, February 4, 1767, that a 'man shall not be allowed to
plead that he was drunk in bar of criminal prosecution,
though, perhaps, he was at the time as incapable of the exer-
cise of reason as if he had been insane, because his drunken-
ness was itself a crime; he shall not be allowed to excuse one
crime by another.' It is a settled maxim of the law 'that a
man shall not disable himself.' "

In the good sense of all this which has been said by our
highest court, the judgment and conscience of every right
minded man must concur. It would never do to proclaim
from this court room, that he who voluntarily takes that which
deprives him of reason, and makes him a wild beast, shall, if
he violates the law whilst in that condition, suffer none of the
consequences of his crime. Such a person has first broken
the obligation which he owes to his fellows in becoming
drunk, and when in that state he perpetrates a crime, it is no
excuse, but rather an aggravation of the offense. That is the
law. It should be heeded here, and by all the public upon
whose ears these words shall fall. At common law, then, if
you found these facts as I have detailed them, and if you
found the intent as the law requires you to find it, this man
would have been pronounced guilty of murder, and his life
would have paid the forfeit of the crime which he has com-
mitted. More recently, however, in this state and in the year
1873, the legislature have seen fit to divide the crime of
murder into two degrees, the one where the intent to take
life was a *deliberate* intent; the other where there is a simple
intent without the deliberation and coolness which now marks
the former, and which is the element making the crime of
murder in the first degree. For example, if a man deliber-

ately plans the death of a fellow-being, and lays in wait for him, and when the person comes along, suddenly springs upon him and kills him; or where it is effected by poison given by degrees at different times and on different occasions, you can readily see the difference between such a case and that of a person who under the intent of excitement strikes a blow. You can at once see there is a wide moral difference between those two classes of crimes. The law has now marked and defined the two by a different species of punishment. I will read you our present statute:

Judge WESTBROOK read the statute as follows:

"When perpetrated from a *deliberate and premeditated design* to effect the death of the person killed or of any human being."

The charge continued: That is to say, not only must the homicide be premeditated, but it must be *deliberately premeditated*. In the coolness of the blood, in the exercise of the judgment and the reason the slayer should plan and determine if the act is to be declared murder in the first degree.

In other words, to convict now of the crime of murder in the first degree, to the element of intent must be added that of *deliberation*, and when this is wanting the highest grade of this crime has not been attained. Where the *intent* to slay is present, but the "*deliberate and premeditated design*" is absent, the crime is only murder in the second degree. This is the change our statute has made. Formerly in every case of homicide where the intent to kill was present, and there were no circumstances rendering the killing justifiable, the crime was murder, of which there was but a single grade, and but one penalty — death. Now the grade of crime which forfeits the life of the slayer, has only been reached where the jury find that the intent is the result of deliberation and premeditation.

In fixing the grade of crime of which the prisoner is guilty the evidence of his intoxication becomes very important, and

is to be carefully weighed. While the law justly holds the offender responsible for the crime of murder, though he was drunk when the act was committed, it will not be guilty of the injustice of saying that when he was crazed, furious and wild from intoxicating drink, and the act was evidently committed under the influence of a drunken frenzy, that it was *deliberate* as well as premeditated. The coolness of the intellect is gone, and a person in that state, ordinarily, is not capable of the deliberation which must mark this crime. In other words it is the premeditation of *excitement* and not that of *deliberation*. I will read to you again to give my views more fully from *Wharton's American Law of Homicide* (*page* 369):

"Intoxication, when existing to a sufficient extent to prevent deliberation, lowers the offense to the second degree. Except in the case of murder which happens in consequence of actual or attempted arson, rape, robbery or burglary, says judge Lewis, now of the supreme court of Pennsylvania, a deliberate intention to kill is the essential feature of murder in the first degree. When this ingredient is absent, where the mind from intoxication, or any other cause, is deprived of its power to form a design with deliberation and premeditation, the offense is stripped of the malignant features required by the statute to place it on the list of capital crimes; and neither courts nor juries can lawfully dispense with what the act of assembly requires."

Judge WESTBROOK continued: I charge you that to be the law of this case. Whilst you cannot receive the evidence of drunkenness to excuse the crime or to make it less than murder in the second degree, yet you can receive it for the purpose of showing that the party did not *deliberately* premeditate. Now, what is the evidence upon this question? It would seem that the day previous to this occasion the prisoner had been at work for Mr. Hasbrouck. On his way home he took probably his first glass of liquor. The next morning at eight o'clock he was in a nervous condition, sitting in the

bar room at Steen's, and from that hour through the entire day he seems to have been not about his ordinary business, but simply upon "a spree;" he became wild, furious, nervous, active, so drunk that he staggered against the fence, and at the time he was leaving the Saxton House, for the purpose of getting the weapon, he was so much under the influence of liquor that he could scarcely walk. After obtaining the weapon he went to the Shaffer House, and from his conduct and actions there, I leave it to you to say whether he was or was not in a condition of mind or body during which he could *deliberate* and *premeditate*. And whilst this is a question of fact, which you must decide, I submit to you, nevertheless, the proposition whether the undisputed evidence in this case does not clearly mark this offense as one of murder in the second degree only. Of course the whole question is with you. You are to pass upon it; you are to decide; you are to decide upon the question of intent under the rules of law I have given you, and you are to fix the degree of crime according as you find deliberate premeditation present or absent. But in leaving this question to you of the degree of crime, I wish to leave it to you with a statement of my own very clear conviction that it is a case of murder in the second degree. There has been some talk in your presence by the counsel in reference to a recommendation of mercy. Upon that question we have nothing to submit; it is for you only.

In conclusion, gentlemen, permit me to say, that I trust you will be governed in all your deliberations by reason and conscience, and I humbly pray that your intellects and hearts may be enlightened and purified by Him who shall judge us all in the last great day.

The jury then retired, and after being absent for a considerable time returned again to the court room, and, through their foreman, announced as their verdict that they found the prisoner at the bar "guilty of murder in the second degree."

Upon the rendition of the verdict, the district-attorney

People agt. Batting.

(*Mr. James M. Van Wagenen*) immediately moved the court for judgment upon the verdict. Whereupon, the usual interrogatories having been propounded to the prisoner, judge WESTBROOK pronounced the following sentence:

Mr. Batting, we have but a single duty to perform, and that is to pronounce the judgment which the law says we must pronounce, and that is imprisonment for life. It is a sad thing for us to speak — as sad for us to speak as it is for you to hear — and yet we have no alternative. We must speak it as the law requires us to speak it, though our own hearts may bleed whilst we utter the words. If you think upon this act for a moment, and as every person reflects upon it, your judgment and theirs must declare that the safety of society, the proper protection of God's greatest and best gift, human life, requires us to utter it.

On the 21st of October, 1874, without provocation—without any previous quarrel, so far as this case discloses—you rushed upon your victim when he was sitting unguarded in his chair, and by three rapid blows with a deadly weapon, sent him in an instant to the presence of his God. It was an awful act, an awful crime. As you look out to-day upon this bright world, does it seem sweet and dear to you? Do you like to look on God's sunshine, and see the beauty wherewith He has clothed the earth and the sky? Do you enjoy life and existence? Remember that your victim's life was as precious to him as yours is to you, and of this you deprived him suddenly and awfully. That others may be deterred from following your example, the law says you must be shut up where you will be a warning to all, and where you will be unable to commit another similar act. We know that you were not in a physical or mental state to comprehend the crime. You were fired by that which has fired many a man before; your brain was crazed by that which has crazed many a brain before; but can courts, in the prevention of crime, listen to an argument and plea like that? If they did or could, whose life would

be safe or whose person secure? We know the safety of human society and human life requires that you should be punished, because you willfully and of your own mind put yourself in that condition. You became voluntarily drunk, and must take the consequences of the act that you did while in such a state. You are guilty of an awful crime, and you are to-day receiving the judgment of this earthly tribunal; but remember you must answer to another, which will judge with entire knowledge, and in the sentence of which there can be no possible mistake. You have time and space for repentance and to make your peace and obtain forgiveness, before you stand in the presence of the August Judge who shall there preside. Perhaps, in saying what we have, our whole duty is done; yet it seems to us a proper time and proper occasion to utter one word more. Is there not a most eloquent appeal from that bleeding body of your unhappy victim, and in his gaping wounds, in your unfortunate condition, and the condition of your family, against that traffic which has brought you to this bar, separated you from your wife and family, and sent Tompkins into the presence of his God? I trust that this sin and this lesson will be remembered and never forgotten. If any other argument is needed against the use of intoxicating drink and the traffic therein, you, on this occasion, furnish that argument, and it is written to-day, as it has ofttimes been written before, in tears and in blood.

The judgment, Robert W. Batting, of the court and the law is, that you be imprisoned during the period of your natural life, at hard labor, in the state prison at Sing Sing.