[Crim. Nos. 3893, 3894.   Second Dist., Div. One.   Oct. 26, 1945.]

THE PEOPLE, Respondent, v. JOE B. GERBEL, Appellant.

Paul E. Tapley and E. W. Miller for Appellant.

Robert W. Kenny, Attorney General, and Carl S. Kegley, Deputy Attorney General, for Respondent.

YORK, P. J.—In the cause presented by appeal numbered 3894, the trial court sitting without a jury found defendant guilty of the crime of grand theft and denied his motion for a new trial, as well as his application for probation. Appeal numbered 3893 arises out of a prior conviction of the crime of burglary, wherein proceedings were suspended and defendant was placed on probation for a period of fifteen years from and after July 2, 1938. By reason of defendant's conviction of the crime of grand theft (Appeal 3894), the court found he had violated the terms of his probation, and revoked the same and entered judgment for burglary (Appeal 3893), the sentences imposed in the two causes to run concurrently.

Defendant here appeals from the judgment of conviction of grand theft in the principal cause and from the order denying his motion for a new trial therein. He also appeals from the order revoking probation in the prior case and from the judgment of conviction of burglary of which he was found guilty in 1938. The appeals in both causes have been consolidated by stipulation of counsel and are presented to this court upon one set of briefs.

It is here contended by appellant that excluding the "involuntary verbal confession" which was forcefully and unlawfully extracted from him, there is no competent legal evidence to sustain his conviction of the crime of grand theft; that errors committed at the trial based upon the alleged inadmissibility of the said confession were prejudicial to his cause, and the conviction based upon the alleged confession is violative of the 14th amendment to the federal Constitution.

An examination of the reporter's transcript of the evidence reveals that on the night of April 7, 1944, a Buick automobile bearing license No. 1F7924 was taken from the

used car lot of the Taylor Automobile Company at 911 West Pico Street, Los Angeles, without the consent of the owner.

Radio Officer Jos. F. Meade, who identified the appellant as the person whom he arrested at about 1 a. m. of April 8th, testified that his attention was first attracted to appellant by the erratic manner in which the Buick car, bearing the license above referred to, was being driven and in which appellant was then seated. The witness stated that he first saw this car going north on Main Street; that it "went right through" the stop signal and turned east on 9th Street, whereupon said witness and his brother officer operating a radio car pursued the Buick which "turned north on Los Angeles Street to 7th; then east on 7th to Alameda"; ran through the stop signs at 7th and San Pedro and at 7th and Central, turned south on Alameda, traveling at a speed of 80 or 85 miles per hour; that the Buick continued south on Alameda picking up speed and "ran through two boulevard stops." That the officers in the radio car turned their spotlight on the Buick and two motorcycles which took up the chase "had their red lights and sirens on directly behind us." The witness further testified that he shot at the Buick five times but it did not stop; that "at 25th and Alameda there is a Pacific Electric right of way crossing there, and the arm for the safety stop on the right of way came down, and their car ran through that arm, that barrier, and knocked the barrier out of the way, and then went onto the railroad tracks where Alameda divided at 25th, and they ran straight out on the railroad tracks, and then they looped to the right out of the railroad tracks into the regular automobile right of way, and at that time we came alongside of them and they hit us and knocked us into the right of way . . . struck our car on the right-hand side and knocked us from the regular automobile right of way into the railroad right of way," putting the radio car out of commission. Thereafter, "the car we were pursuing struck another car, sideswiped another car that was parked on Alameda, and then . . . they came to a skidding stop down about 27th and Alameda, and just before they came to a stop one fellow jumped out of the left-hand side of the car and ran east across the tracks and the other fellow jumped out of the right-hand side of the car and ran into a vacant lot south of the Pacific Freight Lines yard. That was the defendant. We later captured him. . . . The two cars were almost a block apart at the time they stopped, and he, the

defendant, got out into the bushes and humps and valleys where some trash had been dumped, and he fell down in the bushes. He was ducking when he ran, and we had flashlights, and he fell down, and my partner overtook him and shot at him twice, and the second time he shot at him he fell down.'' That they then overtook appellant who ''was lying perfectly still, then I made a start to look for the other fellow, and in the meantime this fellow jumped up and made an attempt to escape and my partner took him back to the car; . . . and on the way back over to the road the defendant turned and struck my partner on the side of his face with his fist,'' whereupon the witness' partner, Officer Lober, ''immediately hit him and knocked him down''; that they then handcuffed him and took him to Central Police Station. Officer Meade then testified regarding a conversation he had with appellant around 1:45 or 2:00 that morning at the station, Officers Simkins, Lober and Ricketts being present; that no force or violence was used on appellant and no promises of immunity or hope of reward were extended to him; that the statements then made by appellant were free and voluntary. The conversation as related by Officer Meade follows: ''We asked the defendant where he had gotten the car, and he stated that they had got the car on Figueroa Street. We asked whose car it was, and he said at first that it was the other fellow's car, a friend of his, but he couldn't tell who the friend was, didn't know who he was. Then later he changed the story and said they got it on Pico Street; that they had stolen it off a lot on Pico Street; that they first had tried to steal a Ford off another lot and couldn't get it started, then they went to this lot and got the Buick started and were headed toward home at East Los Angeles somewhere at the time we saw them.'' Upon cross-examination, said officer testified that the only time he saw appellant struck was when Officer Lober struck him at the time of the arrest; that appellant's face at that time was dirty or dusty but it was not bruised; that appellant had been drinking but that he was then sober.

The above testimony constituted the so-called confession which appellant claims was erroneously admitted because it was induced by force and fear.

Appellant took the stand in his own defense and testified that he left home to buy his wife an Easter present; that he started drinking at various ''taverns'' in downtown Los Angeles finally reaching 5th and Hill Streets where he

remained until around midnight drinking beer and finishing a bottle of whiskey which he bought early in the evening; that he felt "pretty wobbly" and tried to find transportation to his home but failing in this he hailed a passing automobile, got in the car and "must have went to sleep. I finally woke up, there was a thud and somebody opening the door, and the police officer took me out of the car and he hit me in the jaw and I went down, he knocked me down." That he was then handcuffed and taken to the police station where "they started giving me the once-over"; that "they asked me where I got the car, and I told them exactly what happened, and they didn't seem to believe it, so they started getting kind of rough. They knocked me off—I was sitting on a swivel chair, and they knocked me off that, and took my wrists, they were still handcuffed behind me, so one on each wrist started twisting them, and another one lifted up my head by my hair and hit me on the ground that way, on the floor rather, and there was either a lieutenant or a sergeant in there, he had a pair of white gloves, gray colored gloves, he put them on and started cracking me in the jaw, and I was sitting on the chair, and one of them came up and kicked me in the shin, I had a deep gash in that, so finally . . . I told them that it was my brother's car." On cross-examination, appellant testified that he did not believe Officer Lober struck him while he was in the police station; that Sergeant Ricketts hit him "one good one" in the jaw; that Officer Meade hit him several times "fist and hand slap." Appellant further testified that at the time of his arrest he was sitting on the right-hand side of the automobile; that Officer Lober jerked him out and struck him on the left side of his jaw cutting the inside of his lip enough to make him bleed; that when he got to the police station he "was struck all over" and that his head was bleeding; that he received a gash in the shin about an inch long which was bleeding badly; that his shirt was torn to shreds and had a couple of drops of blood down the front of it. He recalled a conversation he had with Officer Ricketts, to wit: "He asked me whose car it was and I told him I didn't know, I was bumming a ride; and it seems as though he was the fellow that looked at my record and he says, 'With a record like this, do you expect us to believe you?' Then there was more names and more punches." He remained at the police station "two or three hours, probably" and was then "taken to Georgia Street Receiving Hospital" for a medical examination. .

The chief clerk of the Georgia Street Receiving Hospital was placed on the stand and read a certified copy of an original record of the hospital to the following effect: "It shows that Joseph Gerbel, aged 24, who lives at 640 South Gearhart Street, was brought into the Receiving Hospital on April 8, 1944, at 4:08 a. m., brought in by radio car No. 11 . . . from Central Jail. The statement of the accident was he had been in a fight and he remained in the Receiving Hospital from 4:08 a. m. until 5:14 a. m., and was taken out with the officers. The doctor who examined him and treated him was Dr. Martchenko, who gave a diagnosis of possible contusion to the scalp, occiput, and the left temple, contusion and abrasion of the dorsum of the right hand. 'H.B.D. three plus, admitted.' Q.. What does H.B.D. mean? A. Had been drinking very much. And tincture of benzoin was applied to his injuries, these contusions and abrasions of the right hand and his left temple. He went out with the officers."

Sergeant Ricketts of the Los Angeles Police Department testified in rebuttal as follows: that he first saw appellant on April 8, 1944, at approximately 1:30 a. m., at the entrance to the police station; that about 45 minutes later he questioned appellant in the presence of Officers Simkins, Meade and Lober, and that appellant remained in the room there in the station until about 3 a. m. This witness denied that he saw anyone strike appellant; denied that he himself punched him or kicked him in the shin; and that appellant stated to him that "he got this automobile off the lot at Figueroa and Pico."

"The question as to whether a proffered confession was freely and voluntarily made by the defendant is one which is to be determined by the trial court, not by the jury.

"The propriety of the court's decision in resolving the question as to admissibility of the confession is to be determined by the reviewing tribunal in view of the discretion with which the trial court is clothed. Where the evidence bearing on the question is conflicting, the decision will not be reversed." (4 Cal.Jur. 10-Yr. Supp. (1943 rev.) 663 and authorities there cited, including *People* v. *Ellis*, 33 Cal.App.2d 616, in which case it was stated at p. 621 [92 P.2d 431] : "In view of the fact that the trial court is clothed with considerable discretion in determining whether or not the confession was free and voluntary, where the evidence, as here, is conflicting on the subject, it must be assumed that the

testimony concerning defendant's admissions was properly admitted. (Citing authorities.)")

"The circumstances of the case are determinative of the question as to admissibility of the proffered confession; the issue is not to be resolved by reference to any rule of law. The scope of the inquiry extends to all circumstances attending the making of the confession, and all such facts are to be considered by the court in determining the question as to whether the confession was made voluntarily or involuntarily.

"Facts not showing involuntary making of a confession have frequently been noted by the reported cases. These include the circumstances that the confession was made to an officer of the law, that the defendant was under arrest, that he was not in possession of his faculties, that his condition was affected by his having taken intoxicating liquor, or drugs; that he was highly excited, or that he was actuated by a purpose to free another from suspicion of guilt. The fact that a confession differs from the testimony of other witnesses does not conclusively show that it was untrue and hence involuntary." (4 Cal.Jur. 10-Yr. Supp. (1943 rev.) 664.) Again, in the same work, p. 667, it is stated: "Preliminarily to the introduction of a proffered confession, the prosecution must present evidence which shows, prima facie, that the confession was freely and voluntarily made by the defendant. This is true only with respect to a defendant's statements which are technically confessions, and only in respect of the introduction of a confession at the trial. . . . The prosecution need not, in the first instance, present proof of the circumstances—time, place and persons present—attending the making of the confession. On the contrary, a witness may be asked as to whether the confession was 'free and voluntary'—although technically the question calls for the statement of a conclusion. The recognized practice, after such a question has been answered in the affirmative, is for the defendant to show, by a cross-examination which he may at once conduct, the entire circumstances surrounding the making of the confession. . . . Nor is the court required to strike out the confession because the defendant testifies that it was made involuntarily, his credibility being a matter for the jury's determination. . . . The propriety of the court's conclusion as to whether the confession was or was not voluntarily made is to be determined by the appellate tribunal in view of the discretion with which the trial court is vested; nor will a reversal

be ordered unless an abuse of discretion has been established by the appellant. The conclusion will not be disturbed where it has support in the evidence, or where the evidence is conflicting.''

In view of the conflict in the evidence, not only as to the method by which the confession was obtained, but also with respect to what occurred at the time of appellant's arrest, there was no abuse of discretion on the part of the trial judge in admitting the confession in evidence; hence, the situation here presented is not one in which a reversal of the judgment of conviction is warranted.

■ Appellant contends that the use of additional evidence of his confession by Sergeant Ricketts in rebuttal constituted prejudicial error, citing in support of such contention the case of *People* v. *Rodriguez*, 58 Cal.App.2d 415, 419 [136 P. 2d 626], in which the court criticized the failure of the State to introduce the alleged confession as a part of its case in chief. In the instant case, the State introduced the confession, brief though it was, as a part of the case in chief, thus avoiding that phase of error condemned in the cited case. Therefore, when it became necessary on rebuttal to use appellant's statements made to and related by Sergeant Ricketts, no prejudice resulted.

■ While there is some support in the record for appellant's claim that he had been drinking heavily over a period of six hours or so, and therefore did not know what occurred while he was riding in the automobile, the evidence also discloses that when the car finally stopped, he jumped out and ran in an attempt to secrete himself from the arresting officers. In other words, the evidence revealed by the record herein is sufficient as a matter of law to support an inference of guilt. In such circumstances, it is well settled that the judgment will not be disturbed on appeal.

For the reasons stated, the judgment of conviction of grand theft and the order denying motion for new trial in cause numbered 3894 are, and each of them is, affirmed. In view of the affirmance of the judgment and order in cause numbered 3894, it follows that the judgment of conviction of the crime of burglary and the order revoking probation in cause numbered 3893 must also be affirmed. It is so ordered.

Doran, J., and White, J., concurred.