[Crim. No. 5017.   Second Dist., Div. One.   Oct. 1, 1953.]

THE PEOPLE, Respondent, v. ROE DALTON WILSON, Appellant.

Max Tendler and William W. Larsen for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the District Attorney of Los Angeles County defendant was accused of the crime of robbery. Following the entry of a plea of not guilty it was stipulated that the cause might be submitted on the transcript of the testimony taken at the preliminary examination, with the introduction of additional evidence.

After reading the aforesaid transcript and reviewing such further evidence, the court adjudged defendant guilty of the offense charged against him, found the same to be robbery of the first degree and that defendant was armed with, but not in personal possession, of a dangerous weapon at the time of the commission of the offense. Motion for a new trial was denied and defendant was referred to the California Youth Authority.

From the judgment of conviction and the order denying his motion for a new trial defendant prosecutes this appeal.

An epitome of the factual background surrounding this prosecution, as revealed by the record, shows that about 8:50 o'clock on the night of July 23, 1953, Joseph Owens and his wife Marguerite were in a liquor store which they owned and operated in the city of Monrovia. Three young men walked into the store in single file. Two of them went back to the cash register and the other "stayed right at the door leaning against the door frame." As they walked in, one of them, who pointed a gun at Mr. Owens, said, "This is it." They tried to get into the cash register, but when they could not open it, they demanded that Mr. Owens do so, which he did. They took the money out of the cash drawer in the register; one of them told the Owenses to stay where they were and not make any noise and they wouldn't get hurt; and then the three young men walked out of the store in single file. All three of the young men wore dark glasses and gloves, two of them had on blue jackets, and one of them had on a light shirt. After they left, Mr. Owens was short $86.69 from his cash register. This money was taken from its owners against their will and without their consent, and while they were in fear of the gun pointed at Mr. Owens.

A two-door Pontiac sedan was seen by Officer Goldsberry, of the Arcadia Police Department, going west. The officers drove alongside the car, told the driver to pull over, and he pulled the car into a parking lot. The officers ordered them all out of the car, and the defendant and three other youths, two aged 17 and one 16, got out. In the back of the car on the left-hand side, there was a gun wrapped in a

blue jacket; on the back seat was a belt with shells in it; and there were six .38 caliber shells in the pocket of the blue jacket in which the gun was wrapped.

Monrovia Police Officer Blair had several conversations with the defendant about the incident at the Owens' Liquor Store on July 23d. He testified there were no threats, force or violence used on the defendant to induce him to talk, there were no promises of reward or hope of immunity extended to him, and his statements on each occasion were freely and voluntarily made.

The first conversation took place on the morning of July 24th in the office of the chief of police in the presence of defendant, Officer Blair, Sergeant Titus of the Glendale Police Department, and another officer. Defendant was asked if he was the driver of the automobile involved in the robbery which had taken place on the previous evening, and the defendant said that he had been the driver of the car, but that he knew nothing of any robbery that had taken place. The defendant was told that the officers had talked with the other three defendants, and had their statements involving him as the driver of the car used by the group. The defendant then said that he might as well tell his story too. He then detailed how he met his three companions on the day in question, stated that he was driving his father's 1947 Pontiac two-door sedan. That the group drove around looking for what "might be a good place to try a robbery." When they arrived at the liquor store here in question, he parked the automobile, his three companions got out of the car and told defendant that if they were gone over 20 minutes, and if there was any shooting, he was to leave without them; that he did not know anything of what ensued until the other three returned to the car and told him to "get going"; that he had a little trouble getting his car started, but after they did start it they drove around until they arrived at Huntington Drive, where they drove west until they were stopped by the police; and that when they saw the police car behind them, Hurley passed the gun to the rear seat.

The second conversation took place on the afternoon of July 24th in the matron's room at the city jail. Present were the defendant and his companions on the preceding evening, namely Hurley, Hill and Miller, together with Officers Blair and Alexander. Officer Blair asked defendant if he had worn the gloves or glasses, to which he replied in the negative stating that these articles were worn by his three associates.

As a witness in his own behalf, defendant testified he was a truck driver, 19 years of age, residing with his parents in the city of Glendale. After detailing his activities during the afternoon of the day in question, defendant testified that he left home after dinner at about 6:15 p.m.; he went to Hill's house, where he met the latter together with Hurley and Miller; they drove around Glendale and finally determined to drive to Duarte; Hurley was directing defendant's driving as they went east on Colorado Boulevard toward Duarte; they stopped at a service station, purchased some gas and then drove out Colorado Boulevard some distance. Hurley then directed defendant on to Foothill Boulevard; as they were driving along the latter boulevard, Hurley told defendant to stop as he wanted to get some cigarettes; they were almost at the end of a block, so he pulled around the corner and parked. There was a market on Foothill, and the defendant said that he would go with them to get the cigarettes; the others said that they would get him some cigarettes and he could wait in the car. He agreed and they left. The motor of the car was turned off. The other three came back to the car in a hurry and said, "Come on, man, let's go, let's go."; he had a hard time starting the car, but eventually did so, and drove down the street he was parked on,' "turned around some blocks" and got on Colorado again. He had not noticed a liquor store in the vicinity of where he parked; only a market. After he had driven along Colorado for about eight blocks an officer in a patrol car motioned him to pull over, so he pulled into a parking lot, where he got out of the car. The patrolman came to the side of the car and told them to line up facing a brick wall. While defendant was there the policeman looked in the car, and defendant turned around and saw him pick up a blue suede jacket, and saw the gun fall out of it. That he had never seen the gun before. The four in the car were taken to jail, and the defendant and Miller were put in a room together. Defendant testified he tried to find out what was the matter, but Miller wouldn't say anything. Defendant was moved to another cell, where he spent the night, and the next day was taken to another jail, where he and Miller talked; Miller "told him everything." Afterwards the defendant was taken to a room where Sergeant Blair and two other detectives asked him to tell them what had happened. Defendant testified he told them about his activities on the previous evening, and told them that he hadn't known any-

thing about the robbery until Miller told him. When he was through Sergeant Blair and one of the Glendale detectives said that he was lying. The Glendale detective said, "All of the other three have signed statements that you knew everything about it." He said,, "Sergeant Blair is your friend." "You are eighteen." "You can be tried in the Juvenile Court." "That would go easier than if you are tried in an Adult Court." "If you don't play along with us, we can get you from five to ten years in Quentin."

After the detective said that he would help him if he "played along," the defendant told him that he "knew everything." But that in fact, he had previously learned from Miller what had happened, and he told the officers about it, stating that he had known that they were going to "pull" the robbery. Defendant testified that he did not tell Officer Blair that he met Hill and Hurley at about 3 o'clock on the afternoon of the 23d, and it would not have been true; he did not tell him that he had seen a gun in the afternoon; but he did tell him that he had pulled up in front of a liquor store which he thought might be a good place to try a robbery, but that there were too many people there, because he was trying to make his story sound good, but it was not true. He did not tell Officer Blair that when he stopped and the other three got out they told him that if they were gone over 20 minutes, and if there was any shooting, he was to leave without them. He had not seen the belt or the bullets which were found in the car until the preliminary hearing. He had never seen the gloves before, and Hurley wore a pair of dark glasses on the night of the 23d. Defendant testified that he had not intended to engage in a robbery, or aid or abet anyone in a robbery, or help or conceal anyone after a robbery was committed.

Several witnesses testified that defendant's general reputation in the community in which he lived, "as being an honest law-abiding citizen," was very good.

In rebuttal, Officer Blair testified that at no time in his presence were any promises made to defendant such as that his case would be filed in juvenile court, or that he would get probation; that never in the officer's presence were any threats made to defendant concerning the term of imprisonment he would receive, or what would be done with him if he confessed complicity in the robbery; that no statements were made as to the difference between the penalty imposed

in a case handled in the juvenile court and that imposed in a felony prosecution in the superior court.

The sole contention made on this appeal is that the court erred prejudicially in denying appellant's motion, made at the conclusion of the trial, to strike from the record the testimony of Officer Blair concerning the incriminatory "admissions and confessions" of the defendant insofar as they may be deemed to be admissions or confessions on the ground that they came within the provisions which preclude a court from considering . . . confessions . . . that are not given freely and voluntarily, without promises and without hope of reward."

The law on the subject of confessions has been very definitely settled; the difficulties lie in its application to particular cases. ██ It is a fundamental rule of criminal law that a confession may not be used against an accused unless the prosecution can show its free and voluntary character; that it was made *without previous inducement* and that neither duress nor intimidation caused the defendant to furnish such evidence against himself.

In the instant case, Officer Blair testified that he had several conversations with appellant concerning the robbery in question and that at no time were any threats, force or violence used on him to induce him to talk, nor was any promise of reward or hope of immunity held out to him, and that his statements on each occasion were freely and voluntarily made.

Thereupon, the attorney for appellant conducted a *voir dire* examination of Officer Blair in which the time, place and parties present at the conversations were established. We do not deem it necessary to set forth in detail the questions asked and answers given during this examination. Suffice it to say, that after several interrogatories were propounded as to promises made or hope of reward extended to appellant, the officer was asked, "And that if he played along with you you would see that he would be certified" (to the juvenile court), to which the officer replied, "I have answered that question, we did not make him any promises, there were no promises made to this defendant."

In determining the admissibility of appellant's statements to the officer the trial court was confronted with the question of credibility of the respective witnesses, viz., Officer Blair and appellant, as to the presence or absence of hopes of reward or immunity as an inducement to appellant to confess his

complicity in the crime charged. The court chose to believe the officer rather than appellant as to the circumstances surrounding the occasions upon which appellant made the inculpatory statements. ▉ It is elementary that the credibility of the witnesses was, in this case where a jury was waived, a matter of the court's determination. ▉ Upon appeal, the correctness of the trial court's conclusions as to whether the confession was or was not voluntarily made, is to be determined by the appellate tribunal in the light of the discretion vested in the arbiter of the facts. And a reversal is not authorized unless an abuse of discretion has been established by the appellant. ▉ In the case now engaging our attention, the evidence as to the confession was in conflict, but there is substantial testimony in the record to show that the confession was freely and voluntarily made. The conflict in the evidence presented a question of credibility, and it was for the trial court to determine whether the confession was freely and voluntarily made and whether it was or was not true. It follows that the trial court did not err in admitting the confession in evidence, and it being properly admitted, there was no error in refusing to strike it out (*People* v. *Gerbel*, 71 Cal.App.2d 325, 331, 332 [162 P.2d 946] ; *People* v. *Bateman*, 80 Cal.App. 151, 156, 157 [251 P. 335]).

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each is affirmed.

Doran, J., and Scott (Robert H.), J. pro tem., concurred.