[Crim. No. 3734. First Dist., Div. One. June 29, 1960.]

THE PEOPLE, Respondent, v. ROBERT D. ALEXANDER, Appellant.

Leo R. Friedman for Appellant.

Stanley Mosk, Attorney General, Arlo E. Smith and Albert W. Harris, Jr., Deputy Attorneys General, for Respondent.

DUNIWAY, J.—Appeal from a judgment of conviction (granting probation) and order denying motion for new trial, upon a charge of arson (Pen. Code, § 448a.) Appellant claims (1) that the evidence is insufficient to sustain the verdict; (2) that the court erred in refusing to instruct the jury upon the defense of unconsciousness (Pen. Code, § 26, subd. Five); and (3) that the court abused its discretion in fixing the terms of probation. We conclude that the judgment must be affirmed.

1. *The evidence is sufficient.*

We, of course, must view the evidence in the light most favorable to the prosecution, in considering this question. We state only that portion of the evidence directly related to appellant's contention, which is that the evidence only establishes that appellant was in the building while it was burning, but does not in any way show that he started the fire.

In the early hours of Sunday, August 10, 1958, a factory building located in San Francisco, the property of Cutler-Hammer, Inc., was severely damaged by fire. The building faces on Third Street and extends to the rear to Tennessee Street, the next street west, and its southern border is formed by a building which contains a grocery store operated by one Aristide Ribolini. The main entrance to the building is on Third Street and is formed by two plate glass doors. A stairway leads from this entrance to a landing, makes a right-angle turn and continues up to a mezzanine floor which extends across the southern end of the building. The first portion of this mezzanine is given to sales and administrative offices, of which there are seven, and two hallways. The building has five doors, three on Third Street, of which one is a "roll-away," and two on Tennessee Street, one of which is also a "roll-away." The roll-away doors are steel and cannot be opened from the outside. They were closed. Of the other two doors (other than the main entrance), one was locked, and the other could not be opened from the outside. Both were forced open by the firemen. It was stipulated that 14 persons had keys to the building, and that, if called, all but the janitor, who worked Saturday morning, would testify that they did not enter the building after Friday.

At 1:10 a. m., appellant, apparently drunk and belligerent, kicked on the door of Ribolini's store. Ribolini told him to go away, threatened to call the police, and did so when appellant persisted. While he was calling, Ribolini saw appellant walk away, and shortly heard the sound of breaking glass. This was at about 1:15 a. m. One policeman arrived at Ribolini's at 1:17 a. m., two others, just afterward. About ten minutes later, Ribolini noticed that the right hand glass door in the main entrance to the Cutler-Hammer building was broken, and that the stairway was lighted. Two of the officers saw a man, dressed, as was appellant, in a sport coat and white shirt, coming down the stairway. He stopped and ran back upstairs. At or about this time, there was a flash of light on the mezzanine. One or more of the officers started up the stairs, but smoke drove them back. At about that time, there was a crash of a window being broken overhead, and appellant appeared, saying, "I can't breathe." Shortly afterward he jumped or fell to the pavement where he lay unconscious. An off-duty fireman saw flames in the building and turned in an alarm, at 1:33 or 1:34 a. m. Appellant's fall to the pavement was immediately afterward. The first

fire truck arrived within three or four minutes, and by that time the fire was vigorous. The entire office areas of the mezzanine was on fire, but the blaze was contained in that area.

Expert testimony showed that the fire was deliberately set in five separate places throughout the office area, including the main office and the top portion of the stairway leading to the main entrance, and that a volatile liquid was used for this purpose. Desk drawers and filing cabinets had been opened in some of the offices. A duplicating machine was located in the main office, and the duplicating fluid which was used in conjunction with the machine might have been the liquid which was employed to initiate the conflagration. The liquid used was of the alcohol group, and the duplicating fluid contained methyl alcohol. The fluid was stored by the machine, there were three cans in that location—one full, one two-thirds full with a plastic pouring spout inserted in it, and one empty, and those cans were not wrapped in paper. After the fire two full cans of duplicating fluid, wrapped in paper, were found near the duplicating machine. Two empty cans, whether or not wrapped the record does not disclose, were found in a pile of debris which had been removed from the building. An empty unwrapped can with a plastic spout was found on top of a desk in the main office.

Appellant suffered no burns, and none of the witnesses had seen any burning, singeing or charring of his clothes. He had lost a shoe at the scene of the fire. It was neither burned nor scorched, and betrayed no trace of a volatile liquid.

When the officers first arrived, they looked for appellant, both on Third Street and on Tennessee Street. No one was seen to enter or leave the Cutler-Hammer building, nor was anyone but appellant found in it.

Appellant first claims that it was physically impossible for him to have set the fire. The argument may be stated as follows: Appellant was in a strange building no more than 18 minutes. In that time it would have been necessary for him to find the volatile fluid, "slosh" it in five separate places throughout the office area, ignite the fire, run down the stairs and then back up, and then jump out of the window. As much liquid as was used to start the fire could not have been thrown "in a quick and indiscriminate manner" from the cans containing the duplicating fluid, without some fluid getting on the clothes of the arsonist. No one detected the odor of methyl alcohol on appellant's clothes, nor were his clothes burned or singed. His shoe was examined and was neither burned nor scorched, nor did it reveal any trace of

a volatile fluid. According to an expert who testified for respondent, if any of the fluid had splashed on the arsonist's clothes, the intense heat would have caused it to ignite and the clothes would have been burned.

No physical impossibility appears as a matter of law from the fact that the floor plan of the building was unknown to appellant, or from the limited time which was available to him. Respondent's expert testified that if one were careful one could splash or throw fluid in the manner in which the arsonist did and from the cans in question, without getting any of it on oneself. Of appellant's clothes, only one shoe was subjected to an examination, and as far as odors are concerned there is testimony that appellant smelled of smoke and fire. According to this expert, a small amount of the fluid on the arsonist's clothes would have evaporated, the fluid being highly volatile, while a large amount would have led to a flaming death.

Appellant next argues that the fire must have started before he entered the building. This argument adds to the physical impossibility argument the testimony of a bartender that appellant was in his bar five or ten minutes before the bartender saw the fire. His testimony is contrary to that of six other witnesses and was doubtless rejected by the jury.

The final argument on the evidence is that it showed no more than opportunity to commit the crime, and "the opportunity to commit an offense can have no weight, apart from other circumstances, unless it excludes all reasonable opportunity for its commission by another, and, standing alone, is insufficient to sustain a conviction." (*People* v. *Tarbox* (1896), 115 Cal. 57, 63 [46 P. 896]; see also *People* v. *Planagan* (1944), 65 Cal.App.2d 371, 412 [150 P.2d 927]; *People* v. *Jollet* (1943), 60 Cal.App.2d 245, 249 [140 P.2d 479].)

The evidence, however, shows more than mere opportunity. Moreover, it could be viewed as excluding any reasonable opportunity for another to commit the crime. Appellant was truculent before Ribolini's store and scarcely less so when he smashed an entry into the Cutler-Hammer building moments later. There was expert testimony that the fire was ignited while he was in the building. Certainly the mezzanine was in flames at the time appellant was seen descending the stairway, and yet as the jury could have found, appellant chose to return to the inferno raging above him rather than take the few remaining steps down to safety and the police. The jury could properly have refused to believe that, while

appellant was wandering through the offices on whatever business he had there, some unknown person was walking about the same area engaged in setting a fire. That body, after observing appellant on the stand and hearing the evidence as to the amount of alcohol he had consumed (appellant's medical expert, to support his diagnosis of unconsciousness caused by intoxication, was constrained to assume that appellant had drunk more than the evidence indicated), may have rejected his claim of amnesia and have drawn unfavorable inferences from his failure to disclose what had occurred while he was inside the building.

There was adequate evidence for the jury to find that all doors which could be opened from the outside had been locked since Saturday morning. As for former employees with keys, Cutler-Hammer's administrative supervisor testified that there had been few of them and he could recall none who had retained his key in violation of the company's rules. If someone had been in the building while appellant was there, he would have had to exit through the mezzanine door on Tennessee Street (the roll-away door was closed and locked) to escape undetected. Two officers searched that street at approximately the time the exit would necessarily have been effected and saw no one.

2. *The court did not err in refusing appellant's instructions on unconsciousness.*

▇▇▇▇▇ Appellant submitted three instructions upon this subject, which were not given. They are set out in the margin.*

---

*Requested Instruction No. 26.

"Section 26 of the Penal Code provides that 'all persons are capable of committing crimes except those . . . persons who committed the act charged without being conscious thereof.'

"Conversely this section provides that no person is criminally responsible for the commission of an act if such person was not conscious thereof at the time of committing the act."

Requested Instruction No. 27.

"Where a person accused of a crime is possessed, at the time the crime was committed, of a state of mind wherein that individual's conscious mind had ceased to operate and his actions are controlled by the subconscious or subjective mind, then under such circumstances the person committing the act is not conscious thereof in the legal sense of the word and must be found not guilty of the crime charged against him.

"Thus, in the instant case, in determining whether the defendant was guilty of the crime charged in the information, if you find from the evidence that the defendant did commit the acts charged but at the time of committing such acts the defendant's conscious mind had ceased to operate and his actions were then and there controlled by his subconscious or subjective mind, then you must further find that the defendant was not guilty of any crime set forth in the indictment or any

For the purpose of this opinion we assume but do not decide that each was correctly phrased under section 26, subdivision five, of the Penal Code, and under the holdings in *People* v. *Sameniego*, 118 Cal.App. 165, 173 [4 P.2d 809, 5 P.2d 653], and *People* v. *Freeman*, 61 Cal.App.2d 110, 118 [141 P.2d 435]. The court did fully instruct the jury in accordance with Penal Code, section 22, dealing with intoxication.

It is urged that the requested instructions should have been given for two reasons, (1) that there was evidence that appellant was unconscious from causes other than voluntary intoxication, and (2) that there was evidence that appellant was unconscious by reason of voluntary intoxication, and unconsciousness so caused brings Penal Code, section 26, subdivision five, into play just as much as unconsciousness arising from any other cause.

■ A defendant is entitled to have the jury instructed on his theory of the case if there is any evidence, no matter how weak, to support his theory. (*People* v. *Carmen*, 36 Cal.2d 768, 773 [228 P.2d 281]; *People* v. *Putnam*, 20 Cal.2d 885, 890 [129 P.2d 367].) We therefore set out the evidence bearing upon appellant's contentions, viewing it in the light most favorable to appellant.

■ Between 7 and 7:30 on the evening of August 9, appellant had three to five drinks of rum and tonic at his home in San Mateo. He then consumed part of a half bottle of wine with his dinner. After dinner, he and a friend who dined with him set out for San Francisco in his sports car. This was at about 10:30. Appellant was then showing the

---

crime included therein and return a verdict finding the defendant not guilty.''

*Requested Instruction No. 28.*

''In order for a person to be unconscious in the sense that such condition relieves him of criminal responsibility for the performance of the act, it is not necessary that such person be in a state of coma or in a condition wherein he can neither move, talk or speak. A person is conscious when his mind is in such a condition that he is immediately aware of the things going on about him and his own acts and conduct, feelings and thought; when such person is mentally alert; when such person was able to deliberate upon his act. In relation to the performance of an act a person is conscious when his conscious mind, as distinguished from his subconscious mind, formulates, considers and prompts the doing of such act. A person is unconscious when the foregoing elements surrounding the doing of any act are not present; when the act is prompted and performed according to the dictates of his subconscious mind; when such person's mentality is neither active nor operating; when such person is unaware of what he is doing or the particular and essential facts constituting the operation in which he is engaged.''

effects of liquor. The car stalled in front of the Potrero police station, two blocks from the Cutler-Hammer building. Appellant was in that vicinity from that time on, attempting to start the car and to telephone the man who sold it to him, and periodically visiting at least two neighborhood bars, at which he drank more liquor. The friend last saw appellant about 1 a. m., and he was then intoxicated. When appellant kicked on Ribolini's door at 1:10, he was drunk and abusive, and said, "Open up, dirty rat, I want to kill you."

Appellant testified that when he and his friend left appellant's house for San Francisco, they drove to the freeway, "and then I draw a blank from there until the time the car pulls up in front . . . of the Police Station." At that time, in appellant's opinion, he was intoxicated. He was able to testify to events which transpired while the car was disabled in front of the police station. According to his testimony, he went into the station to use the telephone and was threatened with the drunk tank if he did not get out. He then returned outside and talked to his friend. Except for a vague recollection of having conversed with the owner of one of the bars, appellant said, "the next thing I know I came to in the hospital." He had no recollection, he assured the jury, of intermediate occurrences.

Appellant was unconscious after his fall to the sidewalk from the second story of the Cutler-Hammer building.

An intern who was on duty at the hospital to which appellant was taken testified that appellant was verbally abusive to persons trying to help him, and that his behavior in general was rather wild and uncontrolled. He thrashed around on the examining table to such an extent that it was necessary to tie down his arms and legs and cut off his clothes in order to examine him. While thrashing about, appellant said that Nazis were after him and he was trying to escape. Hospital records bearing the notes of the admitting surgeon were allowed into evidence without objection. The notation read: "24-year old white male who is conscious, oriented as to time and his condition but not as to place and has paranoid delusions concerning spies, Nazis, 'good' and 'bad' guys. He has A breath." The intern did not know whether appellant's breath had been alcoholic. Referring to the delusions, the intern testified that he had observed the same manifestations, but that he could not venture an opinion as to what had caused them. Appellant was also diagnosed at the hospital as suffering from acute alcoholic hallucinosis.

Appellant called as his witness an expert in nervous and mental disorders, one Joseph Catton, and, based on the reading of a hypothetical question which included all of the evidence now relied on with the exception of the threat to Ribolini, asked the expert for his opinion of appellant's mental condition at the time of the fire. The witness declared that there was no question in his mind that appellant was intoxicated. The diagnosis of alcoholic hallucinosis was "a diagnosis of an actual acute mental derangement and disorder due to alcohol." This diagnosis, taken with appellant's behavior, led the witness to conclude that he could not form a conscious intent. One degree of alcoholism, said the witness, is acute alcoholic hallucinosis, while another even more extreme is "an acute alcoholic paranoid state where they imagine all sorts of delusory things." The expert testified that "when the man gets the hallucinosis and the delusionary concepts, there is no doubt about what did it"—i.e., too much alcohol. This witness also stated on cross-examination that even if appellant before his fall had suffered the delusions later manifested at the hospital, his condition, even though paranoid in nature, would not amount to paranoia.

We can find nothing in the evidence indicating that appellant's claimed unconsciousness was caused by anything other than alcohol, and are therefore of the opinion that appellant must stand upon the proposition that unconsciousness, caused by voluntary intoxication, requires the giving of his proposed instructions. Whatever that position may have to be said for it as a matter of logic, it is foreclosed by the decisions of our courts. Appellant asks us to overrule the "implications" of those decisions. This we cannot do—especially because the rule announced by them is quite clear, not a mere matter of implication.

The most recent decision of the Supreme Court is *People* v. *Gorshen,* 51 Cal.2d 716 [336 P.2d 492]. There, the question was as to the propriety of receiving evidence of an uncontrollable obsession as bearing on the malice aforethought required in second degree murder. By way of dictum, in illustrating its views, the court said (p. 727) : "In *People* v. *Baker* (1954), 42 Cal.2d 550, 575 [268 P.2d 705], this court pointed out that 'Unconsciousness is a complete, not a partial, defense to a criminal charge (Pen. Code, § 26, subd. 5), and, although voluntary intoxication may at times amount to unconsciousness, yet it can only have the effect of negating specific intent,

the applicable code section being section 22 and not 26, subdivision 5.'" The opinion in the Baker case continues: "In this case there was ample evidence of voluntary intoxication, and there was also evidence that defendant was unconscious at the time of the offense because he was in the 'clouded state' of an epileptic attack. The evidence of unconsciousness being present, the instruction based on Penal Code, section 26, subdivision 5, was properly given, for defendant's complete defense based on unconsciousness was entirely separate from his partial defense based on intoxication." (P. 575 of 42 Cal.2d.) In that case, there was evidence that the defendant was unconscious by reason of an epileptic attack. The court's instruction under section 26, subdivision Five, of the Penal Code gave examples of the types of unconsciousness to which the section refers: "somnabulism . . .; the delirium caused by fever, involuntary intoxication caused by drugs or spiritous liquors; and restricted consciousness caused by epilepsy." (P. 575, *fn.*) Thus the approved instruction excluded unconsciousness resulting from voluntary intoxication. However, there was evidence of unconsciousness caused by voluntary intoxication from the taking of drugs, and the court reversed the conviction because requested instructions under Penal Code, section 22, were not given. Thus the court's language, quoted above, is not an "implication," but the rationale of the actual decision.

In *People* v. *Sanchez,* 35 Cal.2d 522 [219 P.2d 9], it was held error not to give an instruction based upon Penal Code, section 22. The court said (p. 531): "In the present case, since the defendant relied upon the partial defense of voluntary intoxication, sufficient to destroy both his volition and his memory, he was entitled to the type of instruction indicated above." There was no suggestion that an instruction under section 26, subdivision Five, was proper or required. See also *People* v. *Sameniego, supra,* 118 Cal.App. 165; *People* v. *Freeman, supra,* 61 Cal.App.2d 110.

It appears to us that Penal Code, section 22, dealing with voluntary intoxication, was intended to and does include that state of intoxication amounting to unconsciousness. The cases cited by the Code Commissioners (the section has not been amended since its enactment in 1872) point to this conclusion. (*People* v. *Belencia,* 21 Cal. 544, 545; *People* v. *King,* 27 Cal. 507, 514 [87 Am.Dec. 95]; *People* v. *Harris,* 29 Cal. 678, 681; *People* v. *Rogers,* 18 N.Y. 9 [72 Am.Dec. 484].) *Belencia* and *King* were both murder cases, and hold that proof of intoxication is admissible on the issue of deliberation and premedita-

tion, but not as an excuse for the crime. In applying the same rule in *Harris* the court said (pp. 682-684 of 29 Cal.) : ''The law does not excuse a person of a crime committed while in a state of voluntary intoxication. In *Rex.* v. *Thomas*, 7 Car. & Payne, 817 Parke, B., said to the jury: 'I must tell you that if a man makes himself voluntarily drunk, it is no excuse for any crime he may commit whilst he is so; he takes the consequences of his own voluntary act, or most crimes would go unpunished;' . . . and in harmony with this doctrine is the whole current of English authority (1 Whar. Cr. Law, § 39.) Mr. Wharton says that in this country the same position has been taken with marked uniformity, it being invariably held that voluntary drunkenness is no defense to the *factum* of guilt; the only point about which there has been any fluctuation being the extent to which evidence of drunkenness is receivable to determine the exactness of the intent or extent of deliberation. (Id. § 40.) . . .

''While the condition of the accused, caused by drunkenness, may be taken into consideration by the jury with the other facts of the case, to enable them to decide in respect to the question of intent, it is proper to observe that drunkenness will not excuse crime. (*People* v. *King*, 27 Cal. 514.) The inquiry to be made is whether the crime which the defendant is accused of having committed *has in point of fact been committed* . . .

''We have said more respecting the character of the defense or excuse imposed than would have been necessary, but for the reason that it is important that those who may be guilty of violating the law may understand that a state of intoxication can be of no avail as an excuse for crime.''

*People* v. *Blake,* 65 Cal. 275, at page 277 [4 P. 1], is equally explicit : ''It has been so frequently and so generally held both in England and the highest courts of this and other States of the Union, that drunkenness voluntarily brought on is no excuse for crime, that it may be considered as settled law. The propriety of such a law is well vindicated by Denio, J., in *People* v. *Rogers,* 18 N.Y. 9 [72 Am.Dec. 484] : 'It will, moreover, occur to every mind that such a principle is absolutely necessary to the protection of life. In the forum of conscience, there is no doubt considerable difference between a murder deliberately planned and executed by a person of unclouded intellect, and the reckless taking of life by one infuriated by intoxication; but human laws are based upon considerations of policy, and look rather to the maintenance of personal se-

curity and social order, than to an accurate discrimination as to the moral qualities of individual conduct. But there is, in truth, no injustice in holding a person responsible for his acts committed in a state of voluntary intoxication. It is a duty which every one owes to his fellow-men, and to society, to say nothing of more solemn obligations, to preserve, so far as lies in his power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable. But if, by a voluntary act, he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which, in that state, he may do to others or to society.' "

Many California cases are in accord: *People* v. *Hower,* 151 Cal. 638 [91 P. 507]; *People* v. *Fellows,* 122 Cal. 233 [54 P. 830]; *People* v. *Franklin,* 70 Cal. 641 [11 P. 797]; *People* v. *Jones,* 63 Cal. 168; *People* v. *Ferris,* 55 Cal. 588; *People* v. *Williams,* 43 Cal. 344; *People* v. *Lewis,* 36 Cal. 531; *People* v. *Anderson,* 87 Cal.App.2d 857, 860-861 [197 P.2d 839]; *People* v. *Taylor,* 31 Cal.App.2d 723, 732-733 [88 P.2d 942]; *People* v. *Lim Dum Dong,* 26 Cal.App.2d 135, 138-139 [78 P.2d 1026].

Some of the foregoing cases deal with attempts to apply Penal Code, section 26, subdivision Three, dealing with insanity, in cases where the ''insanity'' was claimed to result from voluntary intoxication. This was held improper, section 22 being the applicable section. The principle of those cases is equally applicable here.

3. *The court did not abuse its discretion in imposing restitution as a condition of probation.*

 As a condition of probation, the court required reparation (Pen. Code, § 1203.1). The amount, $139,036.05, appears in the probation report, and was based upon letters showing the amounts paid by the various fire insurance companies insuring the premises. Appellant made no attempt to disprove the accuracy of these figures at the probation hearing or otherwise. The report also shows that appellant has assets, consisting of bank accounts and securities, of a value of $627,989, and debts of $2,000. Again, no effort was made to contradict these figures.

Appellant claims that he has been deprived of his property without due process of law. To this there are several answers:

(1) Appellant could refuse probation if he deems the condi-

tion too onerous (*In re Osslo*, 51 Cal.2d 371, 377 [334 P.2d 1] ; *Lee* v. *Superior Court*, 89 Cal.App.2d 716 [201 P.2d 882] ).

(2) Appellant could have urged the contentions he now urges at the hearing on probation, but did not. He had the report two days before the hearing. (Pen. Code, § 1203.) And he could have offered evidence at the hearing. (*People* v. *Loeber*, 158 Cal.App.2d 730, 736-737 [233 P.2d 136].)

(3) Appellant can, at any time during the term of probation, ask for a modification of the order. (Pen. Code, § 1203.3 ; *People* v. *Marin*, 147 Cal.App.2d 625 [305 P.2d 659] ; *People* v. *McClean*, 130 Cal.App.2d 439, 444 [279 P.2d 87].)

(4) The court has a wide discretion in fixing the terms of probation, and in view of appellant's wealth, the condition imposed seems reasonable to us. (*People* v. *McClean, supra,* 130 Cal.App.2d 439—$56,700 reparation; defendants had assets of $120,000.)

Affirmed.

Bray, P. J., and Tobriner, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 24, 1960.