[Crim. No. 7853. Second Dist., Div. One. Mar. 2, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. FRED D. LOCKHART, Defendant and Appellant.

864

Theodore Robinson and Calvin W. Murdock for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Norman Gregory Taylor, Deputy Attorney General, for Plaintiff and Respondent.

LILLIE, J.—This is the second trial of defendant for arson in violation of section 447a, Penal Code. The jury found him guilty; he appeals from the judgment of conviction and order denying his motion for a new trial.

Viewing the evidence and all inferences reasonably to be drawn therefrom in a light most favorable to the verdict the following is a summary of the facts. Defendant is a minister, carpenter and cement mixer. Although actually purchased for a church, defendant bought the property on which the

fire occurred in his own name; the house thereon was a duplex, one side of which was then occupied by a Mrs. Lee and defendant. It was in their living quarters the fire started. Mrs. Lee's furniture was covered by two insurance policies—one for $2,500 and one for $3,000; her claims for fire damage were paid by each company. At the time of the fire defendant was several years in default of payments and was in the process of losing the property; Consolidated House Movers, from whom he had bought it, had been trying without result since July 10 to evict him so they could resell it; defendant finally promised in writing to quit the premises but did not do so.

On August 14, 1960, between 9 and 10 p. m., Brenda Denson and Joanne Floyd, who lived in the neighborhood and who had then known defendant for "a month or so" and had seen him "many" times on the premises, walked up to defendant's house to see a couple of boy friends who lived in the garage area in the rear. They noticed a bright glow through the window; at the same time they saw defendant come out of the house onto the porch, lock the door, and walk to a car (a two-tone Mercury which they identified as his and had seen him drive before) parked in front. Brenda spoke to defendant and as the girls more clearly saw the flames of the fire in the living room through the front window, they called to him as he proceeded from the porch to his car; and in a "real loud voice" Brenda called to him that his house was on fire, but he only turned, looked back at them and the house, got into his car and sped away. Joanne ran for aid; Brenda had someone call the fire department. Before the fire was extinguished defendant and several persons returned to the premises in the same car in which he had driven away. Captain Stone of the fire department testified that the extent of the damage was a circular superficial burn in the center of the composition floor covering in the living room; that the top portion of the walls and ceiling were charred and the room was extensively burned out; and that the sliding glass door in the rear of the house had been broken, but from the location of the glass it had been broken from the *inside* of the house. After the fire had been extinguished and while still on the premises, Joanne told Captain Stone she knew who had started the fire and pointed to defendant's photograph in a family picture album as the man she saw leaving the house. Several hours after the fire, Deputy Sheriff Carlberg of the arson detail conducted an extensive investigation. After a

detailed examination of the living room and its contents, it was his opinion from what he observed that the fire had been set by human hands. Subsequent tests disclosed it had been started with a considerable amount of flammable liquid spread over the floor, although a complete basic burning had left none apparent and any residue had been destroyed by the manner in which the neighbors had extinguished the fire. Carlberg found clothing defendant claimed to be his in a closet on the premises. He further testified that an inspection of the premises next door to defendant revealed an open shed containing a quantity of containers (a hundred cans) of paint, thinner and paint products moderately accessible to defendant's back yard. (Defendant also owned this adjoining property.) He had two conversations with defendant; during the first, on the evening of the fire, defendant told him he owned the house but lived in the garage area in the rear; that two boys generally lived with him; that a neighbor boy with whom he previously had a disagreement could have started the fire; that he and Lillian Lee had dinner with her mother, had gone back to the house where he changed clothes and returned to her mother's home where they picked her up and all three went to a revival meeting at Rosecrans and Avalon Boulevard at 9 p. m.; that he remained there until a neighbor told him of the fire; that he had insurance but did not know what it covered or the amount; that he ate the major portion of his meals at Mrs. Lee's. The second conversation occurred at the sheriff's station. Defendant repeated much the same story and said that while at the revival he spent part of the time on the podium and part of the time circulating among the crowd and that he might have gone just outside the tent during this time.

Defendant offered an alibi defense—that he was at a revival meeting when the fire started—bolstered by the testimony of various ministers and brethren of the church and others who claimed that although there were 3,000 people in the tent they kept defendant in their view at all times, and at 10 p. m. he took the offering which lasted 30 or 40 minutes. Reverend Jones, a neighbor, said he drove to the revival to tell him of the fire. Reverend Akins, Treasurer of the Southwest Church of God and Christ, testified that the property where the fire occurred really belonged to the church although defendant had bought it from Consolidated House Movers in his name since the church had no trustees; that defendant was about to lose it for his failure to make the necessary pay-

ments; that to try to save the property defendant and church officials met with Consolidated on July 15 at which time the church offered to make the payments but Consolidated would not accept them. (On rebuttal, Paul Grader, vice president of Consolidated, testified that during the first part of July defendant was told he was two years in arrears and owed $4,000, and was given 15 days to pay or quit the premises; that later defendant and two church members came to the office and offered $1,000 for a deed, which Consolidated refused inasmuch as defendant was in arrears $4,000, had only paid $800, and was collecting the rents; and that thereafter, beginning July 10, he daily told defendant to quit the premises.) Defendant testified he had no fire insurance on the property; on the night of the fire, around 9 p. m. he went to a revival; he sat on the rostrum, spoke to Reverend Robinson, later took the offering and about 10:30 p. m. Reverend Jones told him his house was on fire; it took him 10 minutes to get home although he had difficulty getting his car out of the parking lot; and his house appeared to have been burglarized because of a broken glass door in the rear and a general disarray of furniture and clothing. He denied setting the fire and asserted he had trouble with the children in the neighborhood who had sworn to get even with him. He testified he owned the property next door but denied there were cans of paint available to him or that it was accessible to him until September 15, 1960.

With a vagueness and confusion characteristic of one who believes in impressing the court with a quantity, rather than the quality, of points on appeal, appellant, for his position that ''The Court Erred in Decisions Questions of Law During Trial'' (A.O.B., p. 33), has scattered throughout his opening and closing briefs numerous instances of alleged error.

He argues first that Joanne's extrajudicial identification of him as the man who started the fire was inadmissible hearsay because she had already identified him in the courtroom. The issue of identity had been raised on the first trial by an alibi defense, and at the outset of the second by defendant's denial it was he who had set the fire. Thus on her direct examination Joanne identified defendant as the person who walked out of the burning house; she also testified that after the fire she talked to the firemen and gave them the information they wanted. Thereafter, Captain Stone testified that immediately after the fire was extinguished and while still on the premises, Joanne told him she knew who had

started the fire, and identified defendant from his photograph in a family album as the person she saw leaving the house. The trial judge received this evidence for the purpose of corroboration and specifically limited it to show the statement was made, not for its verity.

In *People* v. *Slobodion,* 31 Cal.2d 555 [191 P.2d 1], the court held that evidence by a prosecuting witness that she identified defendant in a police lineup was admissible to corroborate her testimony and to rebut any suggestion that her identification in the courtroom was the result of recent contrivance; the same applied to the testimony of the police officer who saw her identify defendant. Appellant argues that here there is no question of recent contrivance. But it is apparent from *People* v. *Gould,* 54 Cal.2d 621 [7 Cal.Rptr. 273, 354 P.2d 865], that no claim of recent contrivance is necessary before an extrajudicial identification is admissible.

██ ''Evidence of an extrajudicial identification is admissible, not only to corroborate an identification made at the trial (*People* v. *Slobodion,* 31 Cal.2d 555, 560 [191 P.2d 1]), but as independent evidence of identity. ██ Unlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached [citations], evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. [Citations.] . . . ██ The extrajudicial identification tends to connect the defendant with the crime, and the principal danger of admitting hearsay evidence is not present since the witness is available at the trial for cross-examination. [Citations.]'' (P. 626.)

██ Unlike in the *Gould* case, *supra,* where Mrs. Fenwick identified defendant from police photos after the burglary, but was unable to identify him during the trial, Joanne and another positively identified defendant in the courtroom as the man they saw walk out of his burning house, lock it and leave; moreover, Joanne's extrajudicial identification was made not from a ''police lineup'' or a ''police rogues gallery'' but from a photograph taken from a family album, completely eliminating possible inference to any prior involvement with the law. We can see little advantage to a cross-examination of Joanne on the subject but contrary to appel-

lant's contention, he did have ample opportunity to cross-examine her had he wanted to do so, but he neither advanced to the lower court the objection he now makes nor asked permission to recall her for further cross-examination. Defendant did not cross-examine Stone on his direct testimony relating to Joanne's out-of-court identification.

Appellant claims that Carlberg's rebuttal testimony that defendant told him that "part of the time I was on the podium, part of the time I was circulating around in the fringes of the crowd saving souls, I was just all over" was improper for it was error "to allow witnesses to repeat on rebuttal testimony previously given by them on the case in chief thus emphasizing by repetition their former testimony." (A.O.B., p. 37.) Carlberg testified he had two conversations with defendant, giving only their substance because the trial judge suggested he "condense his statements" to "get along a little faster." He said that defendant told him that at the revival he spent part of the time sitting on the podium and part of the time circulating around the crowd in his salvation attempts, moving from place to place; and defendant indicated to him that he might have gone outside the tent. Thereafter, numerous defense witnesses testified they had kept defendant in their view at all times in the tent; the effect of their testimony was that he did not leave the tent that evening. Defendant testified he went to the rostrum, sat with the other brethren, took the offering for about 30 minutes, and at 10:30 p. m. Jones told him his house was on fire. He not only failed to testify that he moved around the crowd, but on cross-examination three times denied that he told Carlberg that he "circulated around the crowd both in and outside of the tent and saved souls." Thus, the People had a right on rebuttal to, and did, elicit the "exact words" defendant said to Carlberg in previously describing his actions of the night. This was material for the revival was only a short distance from his house and it would have been a simple matter for defendant, circulating around a crowd of 3,000 people both in and outside of the tent, to have slipped out, set the fire and returned, unnoticed; and his admission to Carlberg that he circulated around the fringes of the crowd lends credence to such an inference. Further, defendant's statement to Carlberg is not in line with the testimony of the other brethren that he was in their view at all times in the tent. Legally the situation is analogous to that in which the prosecution introduces testimony of a defendant's confession, which confession

defendant later denies; there further testimony revealing the detail of the statement constituting the confession may be given in rebuttal. (*People* v. *Gerbel,* 71 Cal.App.2d 325 [162 P.2d 946].)

■ Objected to as improper rebuttal is the testimony of Carlberg that he found a sizable number of cans or containers (around 100) of paint, thinner and paint products in an open shed on the adjoining lot moderately accessible to defendant's back yard.

Carlberg, an arson expert, testified that in his opinion the fire had been set by human hands with a considerable amount of flammable liquid. On cross-examination, defendant asked him if he found any container "around there" that could have led him to believe that any inflammable had been kept in or brought there; he answered "no." Thereafter, defendant testified that prior to the fire he had purchased the adjoining premises and introduced the deed thereto in evidence. This was the first reference to defendant's ownership of the property next door. Thus, at the time he testified he found no container "around there," the area in Carlberg's consideration was obviously limited to the property to which he then knew defendant properly had access. The defendant having later established his ownership of the adjoining premises too, it then became proper for the People to show that on that property and accessible to him, there were in an open shed quantities of containers of paint, thinner, et cetera, similar to types of materials used in starting fire. This is not something the People improperly withheld on its case in chief or even on the cross-examination of Carlberg, for at that time defendant had not yet made his claim of ownership to the property next door. Nor did it prejudice defendant for he was thereafter entitled to cross-examine Carlberg on this subject, which he did not do; and defendant was permitted to, and did, reopen his case to dispute Carlberg's testimony of the accessibility of the flammable material.

■ Appellant claims the evidence that Lillian Lee's furniture had been insured by two insurance companies for $5,500 and that she collected a considerable sum for fire damage was not within the issues because there was no connection between him and Mrs. Lee; further, a carbon copy of one of her policies admitted in evidence was not the best evidence. He overlooks the fact that it was he who originally introduced the issue of insurance and ignores the damaging evidence of his association with Mrs. Lee. Lillian Lee lived

in the part of the house where the fire started; defendant had been seen in her home "many times"; defendant "was living there"; on the night of the fire men's clothing which he admitted "would be his" was found in a closet in Mrs. Lee's living quarters, and defendant had a key to the house, called it "home," and used it as such. (He and Mrs. Lee on the night of the fire had "come *home* to the spot there, changed clothes," and he ate most of his meals there.) Lillian Lee did not testify. In light of this evidence it is folly to argue there was no connection between the two.

To show a lack of motive to set the fire, defense counsel, as one of his first questions of defendant on direct examination, asked him if he had fire insurance; he answered no. Defendant having opened up this subject, and on the issue of motive, it was proper for the People to develop further proof that while defendant may not have had fire insurance on the premises, one so closely associated with him as to share with him her living quarters did carry insurance on her furniture and that she did receive a substantial settlement for fire damage. From the established fact that defendant was losing the property to Consolidated Movers and he upon numerous requests, would not and did not move out, and that Mrs. Lee had insurance on her furniture, it might well be inferred that before quitting the premises defendant, motivated by vengeance, started the fire and attempted to salvage what he could, at least for Mrs. Lee.

In this connection, the court admitted in evidence a carbon copy of one of her insurance policies. An adjuster for one company testified that he had "a duplicate, what we call a home office copy of the original policy," a duplicate made out at the same time as the original; that the original policy is kept in a home office file; and that he inspected the original policy and knew the carbon copy to be a duplicate. With this foundation the carbon was received in evidence (Exhibit 4). ■ "The best evidence rule comes into operation when an attempt is made to offer *secondary* evidence, e.g., a copy, to prove the contents of an original writing. ■ If, however, there is in a practical sense no single original but a number of duplicates of equal reliability, any one could be considered primary evidence and the policy of the rule would be satisfied. This theory is approved by modern authorities . . . (b) *Carbon Copies*: Carbon copies are now generally regarded as duplicate originals, and may be introduced without a foundation of showing unavailability of the original. (See *Pratt* v.

*Phelps* (1914) 23 Cal.App. 755, 757 [139 P. 906]; *Edmunds* v. *Atchison etc. Ry. Co.*, (1917) 174 Cal. 246, 247 [162 P. 1038]; *Hughes* v. *Pacific Wharf & Storage Co.*, (1922) 188 Cal. 210, 219 [205 P. 105]; 13 Cal.L.Rev. 287; 1 So.Cal.L.Rev. 391; McCormick, p. 419; 4 Wigmore, § 1234; 1 Schweitzer 265; 51 A.L.R. 1498.)'' (Witkin, California Evidence § 350, p. 390.)

 Appellant's claim that there is no substantial evidence that the fire was of incendiary origin because the expert considered only portions of testimony favorable to the prosecution in forming his opinion, arises out of a misconception of the basis of Carlberg's opinion. Appellant does not question his qualifications ás an expert. Carlberg testified that several hours after the fire was extinguished he made an arson investigation; that after examining a circular burned area on the living room floor and testing samples of the floor covering, he concluded that the origin of the fire was the circular portion on the floor where a large quantity of inflammable liquid had been poured and set on fire by human hand. His opinion was based on what he himself did and observed—the fact that within the circular burned area no particular spot appeared more burned than any other, the manner in which the furnishings, walls and doors of the room were burned, tests made on parts of the unburned floor covering revealing it could only have been ignited by highly inflammable material, and the extent of the burning and shape of the area affected. He said that while he found no residue, smell or taste of any inflammable liquid, this was not unusual where flammable material had been used—because due to basic burning and the manner in which the fire had been extinguished, it had either been totally consumed by the fire or evaporated or been washed away; and this is supported by other experts. For instance, in *People* v. *Alexander*, 182 Cal.App.2d 281 [6 Cal.Rptr. 153], the court took into consideration the testimony of an arson expert that traces of flammable fluid are not always present because it evaporates and, being highly volatile, burns quickly. And the fact that Carlberg found no can on the premises does not, as urged by appellant, make his testimony ''inherently improbable, incredible, incredulous and unbelievable,'' especially in light of his further testimony that immediately next door on premises also owned by defendant, there were moderately accessible to his back yard, large quantities of paint, thinner, et cetera, in numerous cans in an open shed.

Carlberg's opinion that the fire was of incendiary origin

was based not upon a hypothetical set of facts or upon facts testified to by others but upon his own personal observations which he related to the court. If his uncontroverted testimony concerning what he observed is entitled to credence, and the jury found that it was, then as an expert whose qualifications were not questioned, his opinion based thereon was proper. (*Wells Truckways, Ltd.* v. *Cebrian,* 122 Cal.App.2d 666 [265 P.2d 557] ; *George* v. *Bekins Van & Storage Co.,* 33 Cal.2d 834 [205 P.2d 1037] ; *Zelayeta* v. *Pacific Greyhound Lines,* 10⁴ Cal.App.2d 716 [232 P.2d 572].) Appellant's objection that Carlberg ''only accepted those portions of the testimony which supported his opinion and rejected those portions of the testimony which contradicted his opinion,'' is more properly directed to a situation in which the expert's opinion is based on assumed facts on a hypothetical question or upon facts testified to by others.

 Appellant next complains that the following question asked of Reverend Akins—''if Brother Lockhart had insurance in his name and he collected on the insurance, is there any way that you would know about that?''—is improper as a hypothetical question, ''obviously inconsistent with the evidence upon which it was purported to be based.'' (A.O.B., p. 31.)

Before defendant testified the property had not been insured, Reverend Akins, treasurer of the Southwest Church of God and Christ, testified concerning property and business matters of the church; he spoke with obvious authority and official knowledge of church affairs. He said that the property actually belonged to the church but had been purchased in defendant's name and that the latter managed it for the church and that they were about to lose it for failure to make payments. Then defense counsel asked him ''You know there is no insurance on that property?'' A. ''Well, we hadn't taken out any on it. We was leaving it up to him. See, now, *whether he had it on there, we didn't know* . . . I don't know.'' Immediately thereafter, continuing the subject of insurance opened by defense counsel, the deputy district attorney cross-examined Akins: ''Who would you leave it up to as to the insurance?'' A. ''Brother Lockhart. He was the man that was in charge of the property there and the church. . . .'' Q. ''And the insurance on that, if he had any, which you don't know, would be in his name; is that right, sir?'' A. ''Yes. *If it was any.*'' Then he asked ''if Brother Lockhart had insurance on this house that was in his name and he

collected on the insurance, is there any way that you would know about it?''; Akins answered "no." At the outset, the matter of insurance was highly material on the issue of motive; the question was proper cross-examination, the subject having been introduced on direct; and it was not hypothetical, as urged by appellant, but a direct question based upon facts personally known to the witness. And in light of Akins' declaration the church was the real owner of the property and defendant managed it for the church, who was more qualified to testify to what defendant had done in connection with the property than an official representative of his principal? Moreover, we see no prejudice to defendant for it was later definitely established by him that he had no fire insurance on the property and collected none.

 Claimed as an improper conclusion is Brenda's testimony that defendant had been living on the premises at the time of the fire. Brenda testified she had lived in the area for four years, had know defendant "a month or so" prior to the fire, had seen him drive his car, had seen him on the premises "many times," and had seen him locking the door to his house. Then asked, "Did you know where he lived at this time," she answered, "To my knowledge, I believe that he was living there." Obviously her belief was based on knowledge obtained from her own observations of defendant and his activities. We deem Brenda's testimony permissible opinion. Analogous are the questions relative to ownership, occupancy or possession of property. "Ownership and possession of property are usually regarded as matters of permissible opinion of fact to which a witness may testify." (Witkin, Cal. Evidence, § 180, p. 200.) (*County of Mendocino* v. *Barnard,* 57 Cal.App.2d 450 [134 P.2d 814]; *Skinner* v. *City of Los Angeles,* 5 Cal.2d 317 [54 P.2d 446]; *Strauss* v. *Dubuque, etc. Ins. Co.,* 132 Cal.App. 283 [22 P.2d 582]; *Nathan* v. *Dierssen,* 146 Cal. 63 [79 P. 730].) In *Nolan* v. *Nolan,* 155 Cal. 476 [101 P. 520, 132 Am.St.Rep. 99, 17 Ann. Cas. 1056], referring to certain property, plaintiff's daughter was asked, "Do you know who owns it?" she answered, "My father does." Holding such matters to be discretionary with the trial judge, the court stated they were not subject to appellate review unless "it is made plain that the court's ruling in admitting the evidence has worked an injury. Generally speaking, the admission of the answer to such a question cannot work an injury where a fair latitude upon cross-examination is allowed, for under such cross-examination the facts are certain to

be adduced. . . ." (P. 481.) Ample opportunity was afforded defendant to cross-examine Brenda on this subject but he did not do so.

Also alleged to be an improper conclusion is the testimony of Joanne that there was nothing obstructing defendant's view of the front of the house. She testified that when she and Brenda discovered the flames, Brenda who was 30 or 35 feet from defendant, in a "real loud voice" called to him that his house was on fire, but he kept going from the porch toward his car; that defendant there, in front of the house, "turned around and looked and he looked over his left shoulder" at the house and just kept walking faster, got into the car and "took off real fast." Later she was asked; "By the way, from where the defendant Lockhart turned around, after Brenda had called him and told him that his house was on fire, was there anything obstructing his view of the front of the house?" A. "No." By her answer Joanne in effect described what she herself saw—that there was no object between defendant and his house that would separate his view of it when he turned back and faced it. No one testified to the contrary; no evidence was offered that defendant's vision of his house had not been clear; and defendant did not see fit to cross-examine Joanne concerning it. We see no error in the admission of her testimony.

Appellant's last three points are directed to the sufficiency of the evidence. He claims there is an absence of motive and that the evidence is sufficient "to raise reasonable doubt and entitle appellant to an acquittal." In his brief he extensively argues matters not properly before this court—factual conflicts, the weight of the evidence, the credibility of the witnesses, the strength of his alibi defense, and that his witnesses were trustworthy and credible, ignoring the fundamental rule that these matters are for the trier of fact. (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778]; *People* v. *Jones*, 36 Cal. 2d 373 [224 P.2d 353].) He also overlooks our duty to view the evidence in a light most favorable to respondent and to assume in favor of the judgment the existence of every fact reasonably deducible from the evidence (*People* v. *Daugherty*, 40 Cal.2d 876 [256 P.2d 911]; *People* v. *Crooker*, 47 Cal.2d 348 [303 P.2d 753]); and the rule that a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever there is sufficient substantial evidence to support it. (*People* v. *Newland*, 15 Cal.2d

678 [104 P.2d 778]; *People* v. *Lindley,* 26 Cal.2d 780 [161 P.2d 227]; *People* v. *Kerr,* 37 Cal.2d 11 [229 P.2d 777].)

Moreover, it is the trier of fact and not this court which must be persuaded beyond a reasonable doubt of the guilt of the defendant. (*People* v. *Rankin,* 160 Cal.App.2d 93 [325 P.2d 10]; *People* v. *Bahara,* 159 Cal.App.2d 160 [323 P.2d 453].) It is apparent that the jury, as it had a right to do (*People* v. *Alexander,* 182 Cal.App.2d 281 [6 Cal.Rptr. 153]; *People* v. *Ashley,* 42 Cal.2d 246 [267 P.2d 271]), accepted as true the testimony of the prosecution witnesses and rejected as unworthy of belief the alibi defense and the "absence of motive" offered by defendant and his witnesses.

Viewed in the light of the foregoing, the prosecution evidence leaves no doubt that the fire was of incendiary origin, set with flammable material spread on the living room floor, and that it was defendant who started the fire. Perhaps the evidence, as well, convinced defendant's own counsel for in questioning defendant on direct examination about the property next door he asked him, "Now, in terms of distance, how far apart is this property mentioned in this deed from the property that *you* burned?"

For the foregoing reasons, the judgment and order are affirmed.

Wood, P. J., and Fourt, J., concurred.

A petition for a rehearing was denied March 29, 1962.