[Crim. No. 11984. Second Dist., Div. Four. Sept. 27, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. MELVIN BRESIN, Defendant and Appellant.

234

Paul M. Posner and Russell E. Parsons for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Gerald H. Genard, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—Defendant appeals following his conviction in a jury trial of two counts of grand theft (Pen. Code, § 487), two counts of forgery (Pen. Code § 470), and two counts of procuring a forged instrument to be recorded (Pen. Code, § 115). The imposition of judgment was suspended and defendant was granted probation.

The charged offenses arose out of two separate incidents in which defendant, an aluminum siding salesman, secured purchasers of his employer's siding material. We state

the evidence viewed (as we must) in the light most favorable to the People.

On September 24, 1964, defendant went to the home of Mr. and Mrs. Shelton. He explained to them that he was an executive with Bay City Home Builders (he was in fact a salesman for that company). He could, he informed them, have his company install aluminum siding on their home for the total price, including interest charges, of $2,850. The Sheltons told defendant that they would not be interested if it meant there would have to be a second trust deed on their home. Mr. Shelton testified:

"A. Well, when we was talkin', one of the first things I say, I say, 'There be no trust deed on my property.' That was one of —

"Q. Do you recall what it was that you were discussing that made you raise that question?

"A. Well, during this time we were discussin' the price and the total price and the down payment, and how I would pay this money for this job. So that's why I wanted to inquire that point before we go any further. Before any paper work was done at all, I want to get that well understood I would not give a trust deed, second trust deed on my house."

Defendant assured the Sheltons that it would not be necessary for them to sign a trust deed. He then asked to see the deed to their property, explaining that he wanted to make sure they were buying the property on which the siding would be installed. The Sheltons were also told by defendant that they would get a 20-year written guarantee on the siding and in addition a year's supply of aluminum foil. A contract was then signed by Mr. and Mrs. Shelton.

After the siding was installed the next day, defendant came to the Sheltons' home and presented them with a second contract. This contract contained a total price figure of $4,585.65 for the job completed. After arguing at length that this was not the price quoted by defendant, the Sheltons signed the second contract. Mr. Shelton testified:

"Q. When he asked you to sign it, what did you tell him?

"A. Well, he said the work was done, the job was completed and that was it, I couldn't back out. Well, sign, I mean, that I had to pay for it, you know. So, I signed it, that was all, I stop argument there."

The Sheltons as it turned out had, in fact, also signed a second trust deed on their property, which was filed with the county recorder. Their signatures were witnessed by defend-

ant's signature. They testified that they did not recall signing it and never saw it until the district attorney showed it to them. They had not read the documents they signed. They would not have purchased the siding if they had known their obligation was to be secured by a trust deed. They never received any written guarantee on the siding and only a few packages of aluminum foil were delivered.

Mr. and Mrs. Jackson were also contacted by defendant during the month of September 1964. He came to their home and told them that he was selling aluminum siding with a lifetime guarantee. He said that he picked their home because it was a nice location and would be a good advertisement for his company. He indicated that pictures would be taken of the house with the siding installed and would be seen in a magazine. Mr. Jackson told defendant that he was mainly interested in having an extra room built onto his home because he had thirteen children and only three bedrooms. Defendant told the Jacksons that if they would agree to purchase the siding he would add the extra room as part of the deal. The total cost would be $2,850, and payments would be about $70 a month. They signed a printed form with blank spaces which defendant said was a contract. Mrs. Jackson told defendant she did not want the siding if it meant an additional encumbrance on their house. Defendant assured them that there would be no encumbrance. He stated that he would take their deed with him to make sure the county records indicated that they were the legal owners.

Defendant brought the deed back a few days later. He told the Jacksons that he had ''talked it over'', and had concluded that $70 a month payments would be ''pretty high'' for them to pay and that it probably would be better if they did not add the extra room. That way, the monthly payments could be brought down to about $50. Instead, he said that he would bring them ''enough material to frame the room'' and they could do it themselves. The Jacksons then signed a contract which contained the provision that they pay $54.59 a month for 84 months. The total price of $4,585.56 was not computed and listed on the contract. Neither Mr. or Mrs. Jackson recalled signing a trust deed. Mr. Jackson testified that he saw the trust deed for the first time when it was shown to him in the district attorney's office. They were not told they would have to sign one. As was the case with the Sheltons a trust deed was in fact signed by the Jacksons with defendant again being the subscribing witness. Mr. and Mrs. Jackson would not have entered into the contract if they had known there would

be a trust deed. Nor would they have entered into the contract if they had realized the price was $4,585.56 instead of what they had agreed upon, namely, $2,850. They did not receive the promised material to frame the extra room. They would not have agreed to sign the contract if they had known they would not receive the framing material.

Defendant first contends there is insufficient evidence to support the judgment. We have concluded this position lacks merit, that the jury's determination that defendant was guilty of each of the charges brought is supported by substantial evidence.

As to the two grand theft counts the evidence showed that defendant committed the offense in each instance by inducing the victims to part with value. (*Buck* v. *Superior Court,* 232 Cal.App.2d 153, 160 [42 Cal.Rptr. 527]. See also *Perry* v. *Superior Court,* 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529].) In a nutshell it established that he told both the Sheltons and the Jacksons that no trust deed would be required as part of their respective contracts; trust deeds were in fact required; by this deception defendant induced the Jacksons and the Sheltons to become obligated to pay substantial sums of money. That the defendant harbored the requisite intent to defraud could most certainly be inferred. The testimony of the Jacksons and the Sheltons plainly establishes that they would not have entered into the contracts were it not for defendant's false representations. As the evidence above recited indicates, other false representations were shown to have been made by defendant which the jury could also have found constitute elements of grand theft by false pretenses.

Defendant argues that since the alleged victims testified they could read, their carelessness in failing to read the documents presented to them before signing absolved him from any criminal liability. The rule however is clear that ". . . 'the guilt of the accused does not depend upon the degree of folly or credulity of the party defrauded; the rule invoked affords no defense against a criminal charge.' [Citations.]" (*People* v. *Gilliam,* 141 Cal.App.2d 749, 752 [297 P.2d 468].)

It is further maintained that the testimony of the alleged victims that they did not know they were signing trust deeds was so discredited that it was utterly unbelievable and therefore constituted no evidence at all. To support such assertion defendant points chiefly to the testimony of the People's witnesses that although they could read they failed to observe that they were signing trust deeds. Defendant also notes there

was evidence that Mrs. Shelton and Mr. Jackson each wrote letters at defendant's direction, after the contracts were consummated, which referred to trust deeds; and further, that they made no complaint until contacted by the police over six months later. The jury was presented with the problem of judging the credibility of these witnesses. It chose to believe their testimony of being unaware they had signed trust deeds. That determination is binding on us. The testimony does not fall into the classification of evidence which can be said to be unbelievable *per se* or inherently improbable. (See *People* v. *Carvalho*, 112 Cal.App.2d 482 [246 P.2d 950].)

Concerning the forgery charges, as we have pointed out the evidence established that the Sheltons and the Jacksons each signed a trust deed without knowing they were signing such a document; they did so after being assured by defendant that no trust deed would be involved in the transaction. As stated in *Buck* v. *Superior Court, supra,* 232 Cal.App. 2d 153, 162 (a case quite similar to the instant case in its facts), "Where a person who has no intention of selling or encumbering his property is induced by some trick or device to sign a paper having such effect, believing that paper to be a substantially different instrument, the paper so signed is just as much a forgery as it would have been had the signature been forged. [Citations.]"

Finally, the evidence having established that defendant secured the trust deeds and that they were forged, and having demonstrated that defendant knew these documents would be recorded by his employer, he was guilty of the two counts charging the procuring of forged instruments to be recorded.

Defendant contends that the prosecutor committed prejudicial misconduct in his closing argument to the jury by going outside of the record and putting the business in which defendant was engaged on trial instead of defendant. Our attention is directed to the following remarks:

"What is the psychology of an aluminum salesman? What do they try to do? Well, the first thing they try to do is convince people, as in this case, that they are going to get something that nobody else can get, they are going to do that, and when they walk into the door of anybody's home, the thing is with fraud; 'Don't tell anybody else about this,'

. . .

"The biggest single deceiving point in the whole affair is that they become fast friends with the people. . . . "

No objection by defendant was made to these remarks at the

trial. In any event, even had the objection been properly preserved, we could only conclude that no prejudice to defendant was shown. In his closing argument the deputy district attorney had remarked that from the evidence presented the jury could infer that through his sales approach defendant had tricked the Sheltons and the Jacksons into signing the trust deeds. Indeed, such an inference could reasonably be drawn from the evidence (as we have indicated above). The momentary lapse by the prosecuting attorney into the use of the plural in referring to the subject of his argument, rather than the singular, was harmless under the circumstances.

█ Defendant maintains he was denied the right to counsel for the purpose of making a motion for new trial and denied the opportunity to make a motion for new trial. At the hearing on the date set for sentencing and the ruling on defendant's application for probation, after the court had indicated it had read the probation report and was ready to hear arguments from counsel, defendant's trial counsel indicated that he was moving to be relieved as counsel of record because he was informed defendant had retained other counsel who was then present in court. The attorney referred to (who is defendant's counsel in this appeal) was permitted to address the court. He stated that he was not then representing defendant; however, he had talked with defendant and defendant told him he wanted a motion for a new trial made in his behalf, but indicated his trial counsel thought there were no grounds upon which to make it; he would not represent defendant unless a continuance was granted which would permit him time to look at the transcript to determine if in fact any grounds for a new trial existed; as he had not yet been retained to represent defendant, he was not in a position to make any motion in the proceedings. After listening to these comments the court inquired whether either a motion for new trial or continuance would be forthcoming. Receiving no response, the court, after observing that it knew of no grounds for making a motion for new trial, denied the motion to be relieved previously made by defendant's trial counsel. The latter then argued the question of whether defendant should be granted probation.

When the court denied the motion to be relieved, counsel for defendant continued to effectively represent defendant, presenting arguments in defendant's behalf on the matter at hand, his application for probation (which the trial court subsequently granted). No motion for a new trial was made,

nor was there any motion for a continuance. It must be recognized that an attorney is presumed to be faithful to the best interests of his client, and that the strategy of the trial is to be determined by the attorney, not the client (*People* v. *Chamberlin,* 242 Cal.App.2d 594, 597 [51 Cal.Rptr. 679]); also, that in order to justify relief on the ground of constitutionally inadequate representation of counsel, an extreme case must be shown which indicates counsel's lack of diligence or competence had the effect of reducing the trial to a "farce or a sham." (*People* v. *Reeves,* 64 Cal.2d 766, 774 [51 Cal. Rptr. 691, 415 P.2d 35].) The record here shows that defendant's representation throughout was both vigorous and effective. The question of whether a new trial motion should have been made was clearly a matter of strategy properly left to counsel to decide. The presumption that the attorney was faithful to his client's interests was not rebutted.

Defendant questions two of the conditions of his probation arguing that the trial court abused its discretion in setting them. As one condition the court ordered defendant to "make restitution" to the Jacksons in the amount of $1,735.56, and in like amount to the Sheltons, under terms to be set by the probation officer; in another, that he not take employment which would put him in the position of making sales to the public except upon the further order of the court. When the terms of the probation were read to defendant, he was personally asked by the court whether he accepted those terms. After conferring with his counsel defendant stated that he accepted the terms. Defendant had the right to refuse probation if he felt the terms were more harsh than the sentence imposed (*People* v. *Osslo,* 50 Cal.2d 75, 103 [323 P.2d 397].)

The court has wide discretion in fixing probation terms. (*People* v. *Alexander,* 182 Cal.App.2d 281, 293 [6 Cal. Rptr. 153].) We do not regard the terms imposed here as unreasonable under the circumstances. "If the facts and circumstances indicate any error in the amount of restitution ordered or an injustice appears, the trial judge, upon proper application for modification of the terms of probation, is authorized to modify his original order [citation.]" (*People* v. *Flores,* 197 Cal.App.2d 611, 617 [17 Cal.Rptr. 382].)

The judgment (order granting probation) is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 23, 1966.